No. 85-509

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

STATE OF MONTANA,

        Plaintiff and Respondent,

   -vs-

ROGER LUKE BELL,

        Defendant and Appellant.

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert Holmstrom, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Allen Beck argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Barbara Claassen argued, Asst. Atty. General, Helena
Harold Hanser, County Attorney, Billings, Montana

Submitted: September 12, 1986

Decided: January 9, 1987

Filed:   JAN 9 - 1987

*Ethel M. Harrison*
—————————————————
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Roger Luke Bell, defendant and appellant, was charged by information filed on June 28, 1984, in the District Court of the Thirteenth Judicial District, Yellowstone County, with two counts of deliberate homicide. The information alleged that Bell purposely or knowingly killed Linfred Cattnach and James McBride. Upon a plea of not guilty, trial began on February 11, 1985. After extended deliberations, the jury returned a verdict of guilty on both counts. Bell was sentenced to two 100-year sentences for the homicides. The court also designated him as a dangerous offender and gave him an additional ten years on each count. Bell appeals from the verdict and sentence. We affirm.

On June 22, 1984, two men, Linfred Cattnach and James McBride, were found dead in an alley behind a building located in Billings, Montana. The Billings Police Department was contacted the morning of June 22 by an individual who reported that two men were dead in an alley. Upon investigation, police officers discovered the bodies behind stacks of large tires located near the wall of a building. An autopsy revealed that both men had sustained multiple stab wounds to their chests and each man's throat had been severely cut.

During the evening of June 21, 1984, Bell and John Marshall began walking the streets of Billings drinking wine. Eventually they walked into an alley which had large tires stacked up near the wall of a building. Cattnach and McBride were sleeping in that alley behind the tires. Sam Lionshows was also sleeping in the same area. Lionshows testified that he woke up when Bell jerked his blanket off of him. Bell was

2

holding a knife, and he told Lionshows to leave. Lionshows got up, rolled up his bedroll, and then left.

After Lionshows had left, Bell and Marshall walked about a block away from the tires and sat on a cement slab behind a building. They finished drinking the bottle of wine they had. Marshall testified that Bell then said that he was going to make a "statement" about white guys coming across the tracks. He took off his shoes and started walking across the tracks in the direction of the alley where the tires were. Marshall followed him to that alley. He testified that Bell went behind the tires where McBride and Cattnach were sleeping, and he saw Bell bent over. He then saw Bell moving his arm up and down and heard a gurgling noise. Because he had seen Bell with a knife earlier that night, he believed that Bell was stabbing the two men. Marshall felt sick, so he went back to the cement slab where he and Bell had been drinking earlier.

A short time later, Bell returned to the cement slab where Marshall was sitting. Bell stated that he had enough money for a jug. Marshall testified that Bell took off his socks and put his shoes back on. He noticed that Bell's white socks were stained. As they began to leave, Bell washed blood off of his hands with water from a plastic bottle he had.

Richard Anderson and Sam Lionshows found Cattnach and McBride the morning of June 22. Anderson testified that they went to the men to get some money for a bottle of wine. After finding the two men, they notified the police of the apparent murders.

Sometime later that same day, Marshall spoke with Detective Waters of the Billings Police Department in the

3

parking lot of the Arcade Bar. Waters was questioning people about the killings. Marshall took Waters and other officers to the alley where the men were killed and to the slab where he and Bell had sat the night before. At the slab, Marshall pointed out the white socks that Bell had been wearing.

Bell was arrested on June 23, 1984. He gave a statement to the police the following day wherein he denied any knowledge of the killings. The trial began on February 11, 1985. After extensive deliberations, the jury found Bell guilty of the murders of Cattnach and McBride. Other facts will be brought out where necessary to the discussion.

Appellant has raised six issues on appeal:

1. Was appellant denied due process of law under the Fourteenth Amendment and the right of confrontation under Article II, Sec. 24, 1972 Mont. Const., by the court's refusal to allow him to introduce character evidence and evidence of prior acts of Sam Lionshows and John Marshall?

2. Did the District Court err by allowing the testimony of Detective Hinkel regarding statements made to him by Leland Lockwood?

3. Was appellant prejudiced by an improper view of the scene of the crime by certain members of the jury?

4. Is the verdict supported by substantial credible evidence?

5. Did the District Court commit error by giving the jury an additional instruction during deliberations?

6. Was appellant properly designated a dangerous offender under § 46-18-404, MCA?

4

I

During the cross-examinations of Marshall and Lionshows, appellant attempted to question them regarding their propensity for violence, use of drugs and past acts of violent behavior for the expressed purpose of demonstrating that it was those two who committed the murders rather than appellant. However, the court sustained an objection by the State to this line of questioning. Appellant contends that this ruling denied him his constitutional right to confront the witnesses against him and his right to due process of law.

This Court has not been confronted previously with the argument being raised by appellant; i.e., whether a defendant may properly assert as a defense the allegation that another person committed the crime for which he is accused. Our statutes do not address this issue either. Others states facing this question, however, have allowed a defendant to present evidence showing that a person other than the defendant committed the crime. See, e.g., State v. Hamlette (N.C. 1981), 276 S.E.2d 338; State v. Smith (Mo. 1964), 377 S.W.2d 241. Whether a defendant should be allowed to assert such a defense, and if so, what would be the parameters of acceptable proof under that defense, is an issue which is not ripe for decision at this time.

Rule 103, M.R.Evid., provides:

> (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the

5

context within which questions were asked.

At no time during the trial did appellant make an offer of proof of facts pointing directly to the guilt of Marshall and Lionshows. Even on appeal, he has not pointed to any specific facts indicating that they committed the crimes. Rather, he has merely attempted to show that they have violent dispositions and use drugs, but even these assertions are unsupported. Without any other facts connecting Marshall and Lionshows to the murders of Cattnach and McBride, these contentions are irrelevant. Therefore, because no proper offer of proof was made, appellant cannot claim as error the court's ruling sustaining the State's objection.

II

Appellant contends that the court erred in allowing Officer Hinkel to testify to statements made to him by Leland Lockwood. He argues that because Lockwood had no memory of his conversation with Hinkel, he was denied his right of effective cross-examination. He contends further that Lockwood's prior inconsistent statement should not have been admitted as substantive evidence because there was no assurance of trustworthiness of the statement.

Initially, appellant's first assertion is flawed because it is unsupported by the facts. The State called Lockwood in its case-in-chief. On direct examination, it asked Lockwood whether he knew Bell and whether he had talked to police officers at the Billings Police Department concerning statements made to him by Bell. In response to these questions, Lockwood unequivocally declared that he did not know Bell, had not talked to him at anytime, and did not talk

6

to any police officer about Bell.  Thus, contrary to appellant's contention, Lockwood did not profess an inability to remember whether or not he talked to police officers.  Appellant's contention on this point is wholly without merit.

We now proceed to determine whether Lockwood's prior inconsistent statement can be used as substantive evidence. After Lockwood had denied talking to Officer Hinkel, the State called Officer Hinkel to testify to the substance of Lockwood's prior statement to him.  He testified that Lockwood spoke with him on June 23 about the homicides. Lockwood told Hinkel that he talked with Bell on the morning of the 22nd, and Bell told him that Bell had hurt someone real bad.  Lockwood asked Bell where he had hurt someone, and Bell told him that it was down by the tires.

First, we must determine whether Hinkel's testimony is inadmissible hearsay under our rules of evidence.  Hinkel testified to a statement made to him by Lockwood which, in turn, was made to Lockwood by appellant.  The substance of appellant's statement to Lockwood as related by Hinkel is clearly admissible under Rule 801(d)(2), M.R.Evid.  Appellant's statement to Lockwood to the effect that he hurt someone real bad down by the tires is an admission by a party-opponent and is not hearsay.  Likewise, Lockwood's statement to Hinkel is admissible under Rule 801(d)(1), M.R.Evid., as a prior statement by a witness.  That section provides:

> (d) Statements which are not hearsay.  A statement is not hearsay if:
>
> . . . The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony . . .

Lockwood was the declarant. He testified at the trial and was cross-examined concerning the prior statement to Hinkel. The statement he gave to Hinkel was inconsistent with his testimony at trial. Therefore, Lockwood's statement to Hinkel was not hearsay, and the latter was properly allowed to testify as to its substance at trial.

This same result was reached in a case very similar to the one at bar. In State v. Dolan (Mont. 1980), 620 P.2d 355, 37 St.Rep. 1860, the defendant was accused of robbing a truck stop at gun point. A few days after the holdup, defendant allegedly told one Steele that the Canadian money he had was part of the money he got from the robbery. At trial, Steele could not remember whether defendant told him, "I got the money from the Crossroads," or "I robbed the Crossroads." Later, Detective Warrington testified that Steele told him that defendant said, "I held up the Crossroads." This Court held:

> This evidence is not hearsay . . . The statement made by defendant to Steele is an admission by a party opponent to the action. The statement made by Steele to Warrington is a prior statement of the witness Steele.

Dolan, 620 P.2d at 358-359. See also State v. Fitzpatrick (1980), 186 Mont. 187, 606 P.2d 1343.

A further issue that arises in allowing Lockwood's prior inconsistent statement to be used as substantive evidence is whether such use violates the confrontation clauses of the Montana and United States Constitutions.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The Montana Constitution, in substantially similar language, grants the

8

same right. The primary purpose behind both of these provisions was to prevent an accused from being convicted solely on the basis of ex parte affidavits or depositions. See Mattox v. United States (1895), 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409. It was originally believed and it still is that the best method for obtaining the truth is to have the witness testify under oath at trial and be subjected to cross-examination under the scrutiny of the jury. It is only in this manner that a jury can assess the credibility of a declarant and measure the believability of his statements. Consequently, "it is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause." California v. Green (1970), 399 U.S. 149, 157, 90 S.Ct. 1930, 1934-1935, 26 L.Ed.2d 489, 496.

Where a declarant testifies at trial and either affirms the prior inconsistent statement as his and now gives a new story or denies that he ever made such a statement, the jury has before it two conflicting statements from the same declarant. The defendant has the opportunity to cross-examine the declarant and have him explain why he is giving a statement inconsistent with his prior one. Under such intense cross-examination, literally confrontation, of the witness, the jury has a sufficient basis to test the truth of the prior and present statements of the declarant. It may choose to believe the prior statement or the statement given at trial, or it may give little weight to either statement. Thus, the defendant's right to confront the witness against him has not been abridged.

The United States Supreme Court adopted this view almost twenty years ago in California v. Green, supra.

9

There, one Melvin Porter was arrested for selling marijuana, and he named Green as his supplier. However, at trial, Porter claimed that he was uncertain whether or not Green had been his supplier. The State then called Officer Wade who testified that Porter had named Green as his supplier in an earlier statement to Wade. This testimony was admitted as substantive evidence. The Court held:

> For where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem.

Green, 399 U.S. at 162. See also, Nelson v. O'Neil (1971), 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222. We hold that Lockwood's prior inconsistent statement was properly admitted as substantive evidence.

Finally, we address briefly appellant's contention that prior inconsistent statements can be admitted only when they have an assurance of trustworthiness even where the declarant testifies at trial. Appellant does not cite any authority to support this novel argument, and we have not found any. Concerns with the reliability of a statement normally arise only when the declarant is unavailable to testify at trial. There is no need for a statement to possess a certain "indicia of reliability" in order to be admitted into evidence when the declarant testifies at trial and is subject to full and effective cross-examination. As the Court explained in Ohio v. Roberts (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible

10

only if it bears adequate "indicia of reliability." [Emphasis added.]

Therefore, because Lockwood testified at trial, it was unnecessary for the court to weigh his prior statement for a certain measure of reliability.

## III

After the jury had begun deliberations, the bailiff informed the court that some of the jurors may have visited the scene of the crime. However, within an hour of being informed, and before the court could take any action on the matter, the jury reached its verdict. Subsequently, the court questioned each juror under oath to discover what had occurred. The court discovered that two of the jurors went to the scene of the crime during the trial and discussed their observations with the jury during deliberations. Appellant contends that this unauthorized view constitutes reversible error and prejudiced him because the amount of light available in the alley and the angle of view of Marshall were essential facts in the case.

There is no question that the unauthorized view by the two jurors constituted misconduct. Section 46-16-502, MCA, provides that the jury may view the scene only upon order of the court. Moreover, it is universally held throughout the country that unauthorized views by one or more jurors constitutes misconduct. However, unlike the rule in most states which places the burden on the defendant to show that he was materially prejudiced by an unauthorized view, the rule in Montana has been to presume that the defendant was prejudiced. See 58 A.L.R.2d 1147, 1148. The burden is then placed on the State to rebut that presumption. This standard was

11

announced in State v. Eagan (1978), 178 Mont. 67, 79, 582 P.2d 1195, 1202:

> It is the rule in this state that if jury misconduct is shown tending to injure the defendant, prejudice to the defendant is presumed; however, the presumption is not absolute and may be rebutted by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur.

Upon examination of the jurors, it was determined that two jurors visited the scene. One of them went during a lunch recess because he was curious. He stayed there about one minute. Because he went during the day, he did not have an opportunity to observe the lighting conditions. Furthermore, the investigating officers had moved all of the tires in the alley after taking pictures, so no comparisons could be made between testimony and actual observation. The only arguable issues relating to the scene were the lighting conditions vis-a-vis Marshall's ability to see appellant and the height of the stacks of tires. Since this juror could not observe either of these conditions, no prejudice to appellant could have occurred.

However, the other juror visited the scene during the evening and stayed about one and one-half minutes. This juror did observe the lighting conditions in the area, although he did not conduct any experiments or make any measurements. Officer O'Brien of the Billings Police Department testified at the hearing on the matter that he visited the scene during the trial and during jury deliberations. He also visited the scene the night after the crimes had occurred. At that time, five lights in the area of the alley were working, whereas during the trial, some of those lights were not working. Thus, the lighting conditions during the

12

trial were worse than they were on the night the crimes occurred. Therefore, on the question of Marshall's perception, the juror's observations would have worked to appellant's benefit because it was harder to see in the alley during the trial than it was on the night of the crimes.

The District Court found that appellant was not prejudiced by the improper view taken by the two jurors. We find no error in this ruling. The State rebutted the presumption of prejudice to appellant.

Before we proceed to the next issue, however, a comment about the jury misconduct which occurred here is in order. It cannot be emphasized enough that jurors should not visit the scene of the crime except by order of the court. It is the duty of the trial judge to make sure such misconduct does not occur. Judges should be ever vigilant in impressing upon jurors their responsibility not to have unauthorized views of the scene. In many cases, an improper view would be highly prejudicial to a defendant and would merit a new trial. Consequently, it is a foremost duty of the trial court to impress upon jurors, backed up by the court's contempt power, the rule that unauthorized views of the crime scene shall not be allowed.

IV

Appellant next raises the argument that the verdict is not supported by substantial credible evidence. The applicable standard on this issue was set forth in State v. Cornell (Mont. 1986), 715 P.2d 446, 447, 43 St.Rep. 505, 506:

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

13

The jury heard testimony from John Marshall who testified to seeing appellant bent over the victims making repeated stabbing motions. Marshall also testified that when appellant returned from the alley, his socks were stained and he washed blood off his hands.

The jury also heard testimony from FBI agent Joseph Errera regarding tests he performed on Bell's clothing. He testified that on the items of clothing taken from Bell there were numerous spots of blood and it was possible that McBride or Cattnach were the source. He also performed tests on the socks which were found in the area where Marshall and appellant had been drinking wine. These were the socks that appellant took off after coming back from the alley. Blood on one of the socks could have come from Cattnach but could not have come from appellant nor McBride. Blood on the other sock could have come from McBride or appellant, but could not have come from Cattnach.

Appellant argues that Marshall is not a credible witness. The jury had an opportunity to observe Marshall on examination and cross-examination and apparently believed his version of what happened. Whether a witness is credible or not is a matter solely within the province of the jury. It is not the duty of this Court to make a de novo review of the evidence; rather, we must determine only whether substantial evidence supports the verdict. In this case, reasonable minds could have concluded that appellant committed the crimes with which he was charged.

V

After the jury had been deliberating for over a day, the foreman sent a note to the judge stating that the jury

14

was unable to reach a verdict. The court asked the foreman if an additional instruction would be of any help in reaching a verdict, and the foreman replied that it might; whereupon, the court gave the jury the following instruction:

> The judicial process assigns tasks to the various units. It is the task of the witnesses to testify truthfully as they recall the facts. It is the task of the lawyers to prepare the case for final submission to the tryer [sic] of facts, the jury. It is the task of the judge to preside, instruct you as to the law and to rule on the admissibility of the evidence. It is the task of the jury to decide the case. The ultimate responsibility of the jury is to render a verdict in this cause. You are not partisan nor are you advocates in this matter, but you are the judges; you are the only judges of the facts; it is you and you alone that can render a verdict in this cause. There is no reason to believe that any other 12 men and women would possess anymore ability, intelligence and courage to do the ultimate task assigned to a jury under the American System of Justice.
>
> The final test of the quality of your service will be in the verdict which you return to the Court. It is only by rendering a verdict in this cause that you can make a definite contribution to efficient judicial administration as you arrive at just verdict. I have never asked, as a matter of fact, I have instructed you, that you should not surrender your honest convictions in this matter for the mere purpose of returning a verdict, or solely because of the opinion of other jurors, but this does not mean that you should avoid a task assigned to you of rendering a verdict of guilty or not guilty in this cause.

After approximately eleven hours of further deliberations, the jury reached a verdict.

Appellant contends that the court erred in giving this instruction because it was, in effect, a direction to the jury to enter a finding of guilty or not guilty. This argument is completely without merit. As the emphasized portion

15

of the instruction shows, the court told the jurors not to surrender their honest convictions in order to reach a verdict. Furthermore, this instruction is almost a verbatim recital of the instruction given in State v. Cline (1976), 170 Mont. 520, 555 P.2d 724. The Court in that case approved that instruction. Appellant has not provided any reason why we should not continue to approve that instruction. No error was committed on this point.

## VI

Appellant was designated a dangerous offender pursuant to § 46-18-404, MCA. He contends that this designation is error because the court failed to articulate the reasons for such finding in its judgment.

Section 46-18-404(3), MCA, provides:

> If the court determines that an offender is not eligible to be designated as a nondangerous offender, it shall make that determination a part of the sentence imposed and shall state the determination in the judgment. . .

The court stated in its judgment and commitment that sentence is imposed for the following reasons:

> 1. The Court carefully read and considered the presentence report and is aware that defendant's prior history shows a pattern of illegal activity including numerous misdemeanor offenses and felony convictions for Burglary and Criminal Mischief.
>
> . . .
>
> 3. The Court agrees with the statement made by the County Attorney's office that this was a very vicious crime.
>
> 4. The evidence which the jury considered and which this Court heard indicates that the victims, who were stabbed many times and their throats slashed at a time when they were asleep, were innocent of any provocation.

16

. . .

> 6. Defendant's history and the facts of the crimes for which he is today sentenced establish that he does represent a substantial danger to society.

Not only did the court adequately articulate its reasons for finding appellant dangerous in its judgment, but also the reasons stated are more than sufficient to designate appellant as a dangerous offender. Appellant's contention on this point is frivolous.

For the reasons stated above, the judgment is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices