Hillsborough-northern judicial district
2008-189

### THE STATE OF NEW HAMPSHIRE

v.

### JOSHUA LAMY

Argued: January 15, 2009
Opinion Issued: April 8, 2009

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Theodore Lothstein*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. After a jury trial in the Superior Court (*Abramson*, J.), the defendant, Joshua Lamy, was convicted of three felony counts of aggravated driving while impaired, *see* RSA 265:82 (2004) (repealed 2006; current version at RSA 265-A:3 (Supp. 2008)), two counts of second degree assault, *see* RSA 631:2 (2007), two counts of manslaughter, *see* RSA 630:2 (2007), and two counts of negligent homicide, *see* RSA 630:3 (2007), and was sentenced to the state prison for forty-and-one-half to eighty-one years. He appeals his convictions, arguing that the trial court erred in not dismissing the manslaughter indictment pertaining to the death of D.E., in not

granting a mistrial because of juror misconduct, and in drawing the inference at sentencing that he lacked remorse. We affirm in part, reverse in part, and remand.

The jury could have found the following facts. Around 1:00 a.m. on February 18, 2006, the defendant, while intoxicated, drove his car down Maple Street in Manchester. Traveling at speeds over 100 miles per hour, the defendant ran multiple red lights before colliding with a taxi. The collision caused serious injuries to the defendant and his passenger, as well as the driver of the taxi, Brianna Emmons, and her passenger. The passenger in the taxi later died from her injuries.

Because Emmons was seven months pregnant at the time of the collision, she was brought directly to the labor and delivery floor at Elliot Hospital. As a result of the injuries she sustained, blood flow to the fetus, D.E., was cut off, necessitating an emergency Cesarean section. Prior to the Cesarean section, D.E. showed a severely depressed heart rate of fifty beats per minute. However, by the time doctors extracted D.E. they noted that "he was limp, pale, had no spontaneous breathing on his own, and no detectible heart rate." He was "basically in cardiac arrest."

Nine-and-a-half minutes later, doctors were able to stimulate D.E.'s heart with medication and return his heart rate to normal levels. Through "heroic resuscitative efforts, medications, lines, intubation, and so forth," the doctors were able to stabilize D.E. Once a heart rate was reestablished, doctors immediately gave him medication to maintain his blood pressure and put him on a respirator to assist with his breathing. A birth certificate was issued.

From the moment of extraction, D.E. never showed any evidence of neurological function, and never manifested the ability to breathe on his own. He was removed from life support about two weeks later and died of perinatal asphyxia resulting from maternal abdominal trauma, which was caused by decreased blood flow after Emmons sustained injuries.

At the close of the State's evidence, the defendant moved to dismiss the manslaughter indictment pertaining to D.E., arguing that the State had failed to prove that D.E. was "born alive," as required under New Hampshire law. The trial court denied the motion, stating: "[T]here is evidence from Doctor Andrew that the child was born alive and the weight, if any, to be given to Doctor Andrew's testimony is an issue for the jury and not the court." The case was submitted to the jury, which returned guilty verdicts on all charges.

At sentencing, the trial court stated that it had considered the goals of sentencing, the pre-sentence investigation (PSI) report, the arguments of

counsel, the defendant's prior record, the nature of the charges, the victim impact statements and the defendant's own statement before reaching a sentence. The court then stated:

> [I]n considering all these factors, in light of the goals of sentencing, you have shown complete disregard for human life. . . . In addition, there is a clear escalation of your behavior as evidenced by your motor vehicle and your criminal records. In conclusion, I find that you have learned nothing from those records. You cannot begin to fathom the damage that you have caused because nothing haunts you, and I've also taken into account that you've shown really no remorse, and as point in fact I would put on the record that on the second day of trial, after hours of grueling testimony about the human wreckage at the accident scene, your concern at the end of that day was to dispatch your attorney up to the bench to point out that you want to get back to the House of Corrections in time to be able to take your shower. I watched you today as the victims were reading their statements to the Court and you were looking around the courtroom every time a door opened as if you were bored with the entire thing. You've shown absolutely no remorse.

The trial court then imposed the PSI recommendation, sentencing the defendant to the state prison for forty-and-one-half to eighty-one years. Sentencing for the negligent homicide convictions was held in abeyance pending appeal.

On appeal, the defendant makes three arguments: (1) that the trial court erred in not dismissing the manslaughter indictment pertaining to D.E.; (2) that the trial court erred in not granting a mistrial because of juror misconduct; and (3) that the trial court erroneously drew the inference that he lacked remorse based upon his request to shower after the second day of trial.

## I

■ We first address the defendant's argument that the trial court erred in not dismissing the manslaughter indictment as to D.E. In New Hampshire, to be guilty of manslaughter or negligent homicide, a person must "cause[] the death of another." RSA 630:2, I, :3, II. Our homicide statutes, however, specifically provide that "the meaning of 'another' does not include a foetus." RSA 630:1, IV (2007). This language codifies the common law "born alive" rule. Under that rule, "an infant could not be the subject of homicide at common law unless it had been born alive." *Keeler v. Superior Court of Amador County*, 470 P.2d 617, 620 (Cal. 1970).

The defendant argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that D.E. was in fact "born alive," thus necessitating dismissal under RSA 630:1, IV. Specifically, he argues that the born alive standard requires a fetus to show spontaneous signs of life and be capable of independent existence, that D.E. lacked both, and was therefore not "another" for purposes of the statute.

This case does not require us to decide the oft-debated question of whether to adopt the born alive rule because, as the State and the defendant agree, the legislature already explicitly adopted the rule when it enacted RSA 630:1, IV. Rather, we must first interpret RSA 630:1, IV to determine the point at which a fetus becomes "another" for purposes of criminal liability, and then determine whether there was sufficient evidence to prove that D.E. was "another" as defined in the statute.

We review a trial court's interpretation of a statute *de novo*. *State v. Horner*, 153 N.H. 306, 309 (2006). We are the final arbiters of the legislative intent as expressed in the words of the statute considered as a whole. *State v. Dansereau*, 157 N.H. 596, 598 (2008). We begin by examining the language of the statute, *State v. Whittey*, 149 N.H. 463, 467 (2003), and ascribe the plain and ordinary meaning to the words used, *State v. Langill*, 157 N.H. 77, 84 (2008). We interpret legislative intent from the statute as written and will neither consider what the legislature might have said nor add language that the legislature did not see fit to include. *Dansereau*, 157 N.H. at 598. We also interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.* If a statute is ambiguous, however, we consider legislative history to aid our analysis. *Whittey*, 149 N.H. at 467. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. *Id.* We construe the Criminal Code provisions "according to the fair import of their terms and to promote justice." RSA 625:3 (2007); *see State v. Foss*, 148 N.H. 209, 211 (2002).

We have recognized that our Criminal Code is largely derived from the Model Penal Code. *State v. Donohue*, 150 N.H. 180, 183 (2003). For that reason, we have looked to the Model Penal Code and its commentaries when interpreting analogous New Hampshire statutes. *Id.* The Model Penal Code also adopted the born alive rule, defining a human being as "a person who has been born and is alive." MODEL PENAL CODE § 210.0(1), at 4 (1980). The comments to the Model Penal Code state that "[t]he effect of this language is to continue the common-law rule limiting criminal homicide to the killing of one who has been born alive." *Id.* § 210.1 cmt. 4(c), at 11. Thus, insofar as RSA 630:1, IV is consistent with pre-existing common law, we interpret it as a continuation thereof as opposed to a new enactment. We

must therefore look to the common law origins of the born alive rule and its meaning at the time the Criminal Code was enacted. *Cf. State v. Aldrich,* 124 N.H. 43, 48 (1983).

The born alive rule emerged in fourteenth century England as an evidentiary standard requiring observation of the child to prove the *corpus delecti* in the killing of an infant. *See* Forsythe, *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms,* 21 VAL. U. L. REV. 563, 581 (1987). Because of high infant mortality rates during childbirth, courts required some evidence of a live birth before finding criminal culpability. *Id.* at 590. As it evolved, the common law regarded infanticide as murder " 'only if the foetus is (1) quickened, (2) born alive, (3) lives for a brief interval, and (4) then dies.' " *Keeler,* 470 P.2d at 620 (quoting Means, *The Law of New York Concerning Abortion and the Status of the Foetus, 1664-1968: A Case of Cessation of Constitutionality,* 14 N.Y.L.F. 411, 420 (1968)). Since the rule's inception, the crux of the matter has been the determination of whether or not the infant was ever "alive." *See* Atkinson, *Life, Birth, and Live-birth,* 20 L.Q. REV. 134, 141-56 (1904) (chronicling debate over definition of live birth and proof thereof). Nineteenth century English cases required that the child be "wholly born" with "independent circulation." *See Rex v. Crutchley,* (1837) 173 Eng. Rep. 355, 356; *Rex v. Brain,* (1834) 172 Eng. Rep. 1272, 1272. Proof that the child was separated from the mother and that it breathed was usually enough to satisfy the standard, *Regina v. Reeves,* (1839) 173 Eng. Rep. 724, 725; *Rex v. Poulton,* (1832) 172 Eng. Rep. 997, 997, though breathing was not essential, *Brain,* 172 Eng. Rep. at 1272.

The rule was widely adopted in early American jurisprudence, but received little attention until the nineteenth century, when some state legislatures began enacting feticide statutes, thus modifying the common law. *See* Quay, *Justifiable Abortion — Medical and Legal Foundations,* 49 GEO. L.J. 395, 447-520 (1961) (providing text and development of state laws on feticide). The most high-profile and oft-cited decision addressing the born alive rule was the California Supreme Court's opinion in *Keeler,* 470 P.2d at 624. That court held that the California homicide statute did not encompass the death of a fetus when an estranged husband announced his intent to kill the baby, and then beat and kicked the mother's stomach, causing the death of the fetus. *Id.* at 618. As a result of the decision, a number of states, including California, amended their homicide statutes to include some form of criminal liability for the killing of a fetus. *See, e.g.,* Cal. Penal Code § 187(a) (Deering 2008); Ind. Code § 35-42-1-1(4) (Supp. 2004). The New Hampshire legislature did not then, and has not since, amended our homicide statutes' adoption of the born alive rule.

Today, thirty states have abandoned the born alive rule and imposed some form of liability for the killing of a fetus. The vast majority have done so statutorily,[1] while a small minority have done so judicially.[2] Among those jurisdictions abandoning the rule, the standard varies widely as to when criminal liability attaches, ranging from conception to quickening or viability. *See* 2 W. LaFave, Substantive Criminal Law § 14.1(c), at 422-23 (2d ed. 2003).

Eighteen states, including New Hampshire, retain some form of the born alive rule.[3] Under the rule as it survives today, "If the child is born alive, despite an attack upon it and an injury to the mother while it was in the mother's womb, and the child thereafter dies as a result of the prenatal injury, a homicide has been committed." 2 C. Torcia, Wharton's Criminal Law § 116, at 140 (15th ed. 1994).

In clarifying the rule, courts have held that a child is "born alive" when it has an existence separate and independent of the mother. *See State v. Dellatore*, 761 A.2d 226, 230 (R.I. 2000); *Jackson v. Commonwealth*, 96 S.W.2d 1014, 1014 (Ky. Ct. App. 1936); *Harris v. State*, 12 S.W. 1102, 1103 (Tex. Ct. App. 1889). Before the advances of modern medicine, the extent of an infant's life support was its connection to its mother. Once removed, if unable to show some sign of life and sustain itself, it would die. Thus, the standard required evidence that the infant demonstrate some sign of life after expulsion and detachment from the mother, such as breathing or a

[1] *See* Ala. Code § 13A-6-1 (Supp. 2008); Ariz. Rev. Stat. Ann. § 13-1103A(5) (LexisNexis 2008); Ark. Code Ann. § 5-1-102(13)(B) (2006); Cal. Penal Code § 187(a); Fla. Stat. Ann. § 782.09 (LexisNexis 2008); Ga. Code Ann. § 16-5-80 (2007); 720 Ill. Comp. Stat. Ann. 5/9-1.2 (West 2002); Ind. Code § 35-42-1-1(4); Iowa Code Ann. § 707.8 (West 2003); Kan. Stat. Ann. § 21-3452 (2007); Ky. Rev. Stat. Ann. § 507A (LexisNexis 2008); La. Rev. Stat. Ann. § 14.2(7) (Supp. 2008); Mich. Comp. Laws. Ann. § 750.322 (West 2004); Minn. Stat. Ann. § 609.2661 (West 2003); Miss. Code Ann. § 97-3-37 (2006); Mo. Rev. Stat. § 1.205 (2000); Nev. Rev. Stat. Ann. § 200.210 (LexisNexis 2006); N.D. Cent. Code § 12.1-17.1-01 to -06 (1997); Ohio Rev. Code Ann. § 2901.01(B)(1)(a)(ii) (LexisNexis Supp. 2008); 18 Pa. Cons. Stat. Ann. §§ 2601-2609 (West 1998); R.I. Gen. Laws § 11-23-5 (2002); S.D. Codified Laws § 22-1-2(50A) (Supp. 2008); Tenn. Code. Ann. § 39-13-214 (2006); Tex. Penal Code Ann. § 1.07(a)(26) (Vernon Supp. 2008); Utah Code Ann. § 76-5-201(1)(a) (2003); Wash. Rev. Code § 9A.32.060(1)(b) (2008); Wis. Stat. § 940.01(1)(b) (2008).

[2] *See Com. v. Cass*, 467 N.E.2d 1324, 1325 (Mass. 1984); *Hughes v. State*, 868 P.2d 730, 734-35 (Okla. Crim. App. 1994); *State v. Horne*, 319 S.E.2d 703, 704 (S.C. 1984).

[3] *See* Alaska Stat. § 11.41.140 (2008); Colo. Rev. Stat. § 18-3-101(2) (2008); Del. Code Ann. tit. 11 § 222(22) (Supp. 2008); Haw. Rev. Stat. Ann. § 707-700 (2008); Mont. Code Ann. § 45-2-101(29) (2007); Neb. Rev. Stat. § 28-302(2) (1995); N.H. RSA 630:1, IV; N.Y. Penal Law § 125.05 (McKinney 2004); Or. Rev. Stat. § 163.005(3) (Supp. 2008); *State v. Anonymous (1986-1)*, 516 A.2d 156, 160 (Conn. Super. Ct. 1986); *Williams v. State*, 550 A.2d 722, 726 (Md. Ct. Spec. App. 1988), *aff'd* 561 A.2d 216 (Md. 1989); *State in the Interest of A. W. S.*, 440 A.2d 1144, 1145 (N.J. Super. Ct. App. Div. 1981); *State v. Willis*, 652 P.2d 1222, 1226 (N.M. Ct. App. 1982); *State v. Beale*, 376 S.E.2d 1, 4 (N.C. 1989); *State v. Oliver*, 563 A.2d 1002, 1004 (Vt. 1989); *Lane v. Com.*, 248 S.E.2d 781, 784 (Va. 1978); *State ex rel. Atkinson v. Wilson*, 332 S.E.2d 807, 812 (W. Va. 1984); *Bennett v. State*, 377 P.2d 634, 636 (Wyo. 1963).

detectable pulse. *See People v. Bolar*, 440 N.E.2d 639, 645 (Ill. Ct. App. 1982); *Huebner v. State*, 111 N.W. 63, 64 (Wis. 1907) (taking several breaths sufficient to show independent existence with respiration and circulation); *Harris*, 12 S.W. at 1103 (air in an infant's lungs is sufficient corroboration of fact it was born alive).

As medical technology has advanced, however, so too has the born alive rule. Through the efforts of doctors and technology, a fetus can now be delivered with no heartbeat, no breathing, and no brain function, yet have those functions artificially resuscitated and maintained some time later. Because of these advances, states employing the born alive doctrine have required that the child show some spontaneous sign of life, as well as the ability to exist independent of artificial support at some point in the future. *See* Alaska Stat. § 11.41.140 ("A person is 'alive' if there is spontaneous respiratory or cardiac function or, when respiratory and cardiac functions are maintained by artificial means, there is spontaneous brain function."); *Dellatore*, 761 A.2d at 230-31 (affirming jury instruction that child must have lived separate and apart from its mother without artificial means); *People v. Chavez*, 176 P.2d 92, 95 (Cal. Dist. Ct. App. 1947) (holding that if separated from its mother, the child must be able to "live and grow in the normal manner").

We now turn to the interpretation of our own statute, and the determination of when a fetus becomes "another" for the purposes of criminal liability. Like other states facing the same task, we begin by considering the legislature's definition of live birth in the vital statistics statutes. *See, e.g., People v. Flores*, 4 Cal. Rptr. 2d 120, 125 (Ct. App. 1992); *Bolar*, 440 N.E.2d at 644; *State v. Green*, 781 P.2d 678, 683 (Kan. 1989). Under RSA 5-C:19 (Supp. 2008), hospitals and institutions must report every live birth to the division of vital records administration within the New Hampshire Department of State. As to which births must be reported, the legislature provided:

> "Live birth" means the complete expulsion or extraction from its mother of a product of human conception, irrespective of the duration of pregnancy, which, after such expulsion or extraction, breathes, or shows any other evidence of life, such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.

RSA 5-C:1, XIX (Supp. 2008). Both provisions were part of a broad revision of RSA chapter 5-C prior to transference of the vital records administration from the department of health and human services to the department of

state. Laws 2005, 268:1. Though informative to our analysis, the civil statute does not control our interpretation of the Criminal Code.

The State does not argue that the born alive rule does not apply in this case. Rather, it argues that the definition of live birth in RSA 5-C:1, XIX supersedes the common law born alive rule, and requires only that the child either take a breath or have circulation independent of the mother, irrespective of artificial life support. Whether a fetus is born alive, the State argues, is a matter of medical determination, and the issuance of a birth certificate should be *prima facie* evidence of such a birth. The State argues that under that standard, there was sufficient evidence to prove that D.E. was born alive. We disagree.

■ To apply the definition of live birth in RSA 5-C:1, XIX to our homicide statutes without considering the legislature's explicit adoption of the born alive rule and the common law definition of "born alive" would be inconsistent with the approach taken by other states and our own application of the Criminal Code. *See Donohue*, 150 N.H. at 183 (looking to the Model Penal Code); *Aldrich*, 124 N.H. at 48 (looking to common law definitions when Criminal Code was adopted); *see also Chavez*, 176 P.2d at 95; *Flores*, 4 Cal. Rptr. 2d at 125; *Dellatore*, 761 A.2d at 230-31; *Bolar*, 440 N.E.2d at 644; *Green*, 781 P.2d at 683. Although the definition of live birth in RSA 5-C:1, XIX does not mention artificial life support, it does require "evidence of life." We read this to be consistent with the common law surrounding the born alive rule, which also requires such evidence, demonstrated by some spontaneous sign of life. *See Chavez*, 176 P.2d at 95; *Dellatore*, 761 A.2d at 231. The inclusion of "definite movement of voluntary muscles" within RSA 5-C:1, XIX demonstrates the legislature's intent that the evidence concerning live birth must be of a spontaneous nature as opposed to artificially supported vital functions. We therefore hold that, at the very least, an expelled or extracted fetus must show some spontaneous sign of life before it is considered "another" and its death can result in criminal prosecution.

Indeed, had the legislature intended to overturn established common law defining when criminal liability attaches to the killing of a fetus, it would have done so in one of the six revisions of RSA 630:1 since its enactment in 1971. In 1967, the legislature established a commission to study and recommend a consolidated and modern Criminal Code. Laws 1967, ch. 451. When the Criminal Code was first put before the legislature for enactment four years later, the commission reported that the bill " 'perhaps received more time and study than any other single legislative proposal in [New Hampshire's] history on the part of people interested in its work.' " N.H.S. JOUR. 1642 (1971) (quoting statement of then Chief Justice Kenison). In

1974, the legislature created our capital murder statute, but did not amend or repeal the definition of "another" in RSA 630:1, IV. *See* Laws 1974, 34:1. In 1977 the legislature revisited the capital murder statute and provided procedural requirements for such cases, leaving RSA 630:1, IV intact. *See* Laws 1977, 440:1, 588:41. In 1988, 1990 and 1994, the legislature again amended the capital murder statute, broadening its application to additional offenses, but only amended RSA 630:1, IV so as to apply it to the newly created capital offenses. *See* Laws 1988, 69:1, :2; Laws 1990, 199:1; Laws 1994, 128:1, :2. Finally, in 2005, the legislature limited application of the capital murder statute to individuals over the age of eighteen, but did not amend the definition of "another." *See* Laws 2005, 35:1. The history of our homicide statutes demonstrates the legislature's intent to adopt and continue the application of the common law born alive rule in New Hampshire.

Next, we must determine whether the State presented sufficient evidence to prove that D.E. was born alive under this standard. In making that determination, we examine the evidence in the light most favorable to the State. *State v. Hudson*, 151 N.H. 688, 690 (2005). We also take all inferences from the evidence in the light most favorable to the State. *Id.*

Even if we assume, as the State argues, that a birth certificate is *prima facie* evidence of a live birth, such evidence, by definition, creates only a rebuttable presumption. *See* BLACK'S LAW DICTIONARY 1228 (8th ed. 2004) (*prima facie* means: "Sufficient to . . . raise a presumption unless disproved or rebutted"); *see also State v. Buckwold*, 122 N.H. 111, 112 (1982) (stating presumption is rebuttable); *Abbott v. Insurance Co.*, 89 N.H. 149, 153 (1937) (holding death certificate is *prima facie* evidence of cause of death, but can be overcome by evidence demonstrating its lack of reasonable credibility). The issuance of a birth certificate reflects a doctor's belief that a "live birth" has occurred, but has no effect upon the interpretation of the statute and the common law surrounding the born alive doctrine, which is a matter of law.

■ Here, D.E. never displayed any spontaneous sign of life. The medical examiner testified that D.E. was essentially in cardiac arrest when born, and was only able to manifest some signs of life after extensive resuscitative efforts. D.E. was never able to breathe without the aid of a respirator, required medication to maintain his blood pressure and never acquired any brain function. The medical examiner testified that D.E.'s brain "was liquified by the time [he] examined him at age fourteen days," and he never experienced consciousness. The medical examiner based his opinion that D.E. was born alive upon D.E.'s pre-extraction heart rate, his body's reaction to resuscitative efforts and doctors' ability to artificially restore

and maintain a heart rate. There was, however, no testimony that D.E. ever exhibited any spontaneous sign of life "such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles." RSA 5-C:1, XIX. Because there was no evidence to support a finding of spontaneous signs of life, there was insufficient evidence to support the convictions, and it was error to allow the question to go to the jury.

■ We recognize, as have many other courts, that the born alive doctrine may be an outdated anachronism often producing anomalous results. *See Atkinson*, 332 S.E.2d at 810; *People v. Greer*, 402 N.E.2d 203, 209 (Ill. 1980); *A. W. S.*, 440 A.2d at 1146; *People v. Guthrie*, 293 N.W.2d 775, 778 (Mich. App. 1980). However, because the legislature explicitly chose to adopt the rule as statutory law, we cannot "mold, change, [or] reverse" the doctrine as we could were it still common law. *Guthrie*, 293 N.W.2d at 778. In cases of criminal law, "[i]t is the province of the legislature to enact laws defining crimes and to fix the degree, extent and method for punishment." *State v. Rix*, 150 N.H. 131, 134 (2003) (quotation omitted); *accord Atkinson*, 332 S.E.2d at 810; *Green*, 781 P.2d at 683; *Greer*, 402 N.E. at 209; *Guthrie*, 293 N.W.2d at 778, 780. Should the legislature find the result in this case as unfortunate as we do, it should follow the lead of many other states and revisit the homicide statutes as they pertain to a fetus.

II

The defendant argues that the trial court erred in not granting his motion for a mistrial because of juror misconduct. During jury deliberations, Juror 3 reported that Juror 9 had made comments indicating that he had returned to the scene of the collision to investigate after the jury's pretrial view. The trial court conducted a *voir dire* of Juror 9, who denied having returned, and insisted that his comments pertained to the pretrial view of the scene. The trial court then conducted a *voir dire* of Juror 3, who maintained that Juror 9 had said: "I went back to the scene and I looked over that metal object and you could see two hundred feet." She was adamant that Juror 9 had not been referring to the pretrial view, but had returned independently. The trial court then conducted an individual *voir dire* of the remaining jury members.

Juror 2 remembered Juror 9 saying that he "had been to that intersection and looked to the right to see if he could see how far down the road," and believed he had done so during the trial. Juror 4 remembered Juror 9 saying that he had looked right at the intersection, but was unable to remember if he said he had gone back independently. Juror 5 thought she heard Juror 9 say he had returned to the scene, but thought he may have been referring to his observations during the sanctioned view. Juror 6 stated: "[H]e said he went back, stopped at the . . . light, and then . . . looked

down." Juror 7 recalled that Juror 9 told the others that he had returned to the scene and "looked at it from different angles." Jurors 1, 8, 10, 11 and 12 did not recall Juror 9 making any such comment.

After the initial *voir dire*, the trial court was unable to determine whether any misconduct had actually occurred, but, out of an abundance of caution, dismissed Juror 9. The trial court then individually recalled those jurors who believed Juror 9 had said he returned to the scene and asked them if they could remain impartial. Juror 3 said that she would be unable to remain impartial and the trial court dismissed her. The remaining jurors had either not heard the comment, or assured the trial judge that they could disregard the comment and remain impartial in their deliberations. The defendant moved for a mistrial, which the trial court denied. The trial court added two alternates to the panel and instructed the jury to restart deliberations.

It is axiomatic that a defendant has a right to be tried by a fair and impartial jury. *State v. Brown*, 154 N.H. 345, 348 (2006). Any juror found to be disqualified before or during trial should be removed. *Id.*; *see* RSA 500-A:12, II (1997). "We have previously decided that when there is also an allegation that a juror has been biased by extrinsic contact or communication, the trial court must undertake an adequate inquiry to determine whether the alleged incident occurred and, if so, whether it was prejudicial." *Brown*, 154 N.H. at 348 (quotation omitted).

"In a criminal case, a defendant must prove actual prejudice, although such prejudice is presumed when there are communications between jurors and individuals associated with the case or when the juror's unauthorized communications are about the case." *State v. Bathalon*, 146 N.H. 485, 487 (2001). "In those instances the burden shifts to the State to prove that any prejudice was harmless beyond a reasonable doubt." *Id.* at 488. The defendant argues that this presumption should also apply when a juror returns to the scene for an unauthorized view. He argues that our cases concerning extraneous communications are analogous, in that the misconduct here involved extrinsic influence upon the jury's deliberation.

In previous cases we have limited the presumption of prejudice to communications, but only because the misconduct in those cases involved communications. *See id.* at 487. We now extend the same presumption to a juror's unauthorized view of the crime scene. The same danger is present here as when a juror is party to extraneous communications concerning the case. In both instances, the juror may base his or her decision upon evidence that the defendant never had any opportunity to examine and present to the jury. *See State v. Coburn*, 724 A.2d 1239, 1241 (Me. 1999); *State v. Bell*, 731 P.2d 336, 341 (Mont. 1987). We therefore hold that, when

a juror is exposed to extraneous information sufficiently related to the issues presented at trial, a presumption of prejudice is established, and the burden of proof shifts to the State to prove that the prejudice was harmless beyond a reasonable doubt.

The State argues that even if we adopt the presumption, it met its burden to prove that the prejudice was harmless. We agree. In cases such as this, it is within the trial court's discretion to determine what constitutes an "adequate inquiry" into juror misconduct. *State v. Rideout*, 143 N.H 363, 365 (1999). The most common approach is to remove the offending juror and undertake individual *voir dire* of the panel. *See Bathalon*, 146 N.H. at 488; *see also United States v. Resko*, 3 F.3d 684, 691 (3d Cir. 1993). This is a fact-specific determination, which we review for an unsustainable exercise of discretion. *Brown*, 154 N.H. at 349; *Bathalon*, 146 N.H. at 488; *Rideout*, 143 N.H at 365.

Here, the trial court was not able to determine if any misconduct had even occurred. For the purposes of its evaluation, however, it assumed that Juror 9 returned to the scene and that his doing so was misconduct, and therefore dismissed him. The trial court also dismissed Juror 3, the only juror to say that she could not disregard the statement. After individual *voir dire* of the remaining jurors, the trial court was convinced that the panel could reach an unbiased verdict based solely upon the evidence introduced at trial. In reaching this conclusion, it relied upon the jurors' statements that they could remain impartial and would follow the trial court's instructions. Because there was sufficient evidence upon which the trial court could conclude that any prejudice was harmless beyond a reasonable doubt, the State met its burden. Based upon the trial court's procedure, the jurors' testimony and the curative instruction, we cannot say that the trial court erred in finding no actual prejudice and denying the defendant's motion for a mistrial. *See United States v. Boylan*, 898 F.2d 230, 262 (1st Cir.) ("[A] juror is well-qualified to say whether he has an unbiased mind in a certain matter." (quotations omitted)), *cert. denied*, 498 U.S. 849 (1990); *see also State v. Smart*, 136 N.H. 639, 658 ("Our system of justice is premised upon the belief that jurors will follow the court's instructions.") *cert. denied*, 510 U.S. 917 (1993).

## III

We now turn to the defendant's argument that the trial court erred in drawing the inference that he lacked remorse based in part upon his request to return to the house of corrections in time to shower after the second day of trial. The defendant acknowledges that he did not contemporaneously object to the trial court's statement, and relies upon our plain error rule in seeking review. *See* SUP. CT. R. 16-A.

■ The plain error rule allows us to consider errors either not brought to the attention of the trial court or not raised in the notice of appeal. *Id.* "The rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." *State v. MacInnes*, 151 N.H. 732, 736-37 (2005). Thus, to fall within the plain error rule: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. *Id.* at 737. We have looked to the United States Supreme Court's standards for the application of the federal plain error rule to inform our application of the State rule. *See id.*

[9] On appeal, the defendant argues that the plain error was the trial court's reliance upon impermissible factors in reaching a sentence. Specifically, he relies upon *State v. Burgess*, 156 N.H. 746 (2008), to argue that consideration of his request to shower was a violation of the basic principles of due process. In *Burgess*, we held that a trial court cannot consider a defendant's silence as a factor in determining lack of remorse when the defendant has maintained his innocence throughout trial. *Burgess*, 156 N.H. at 757-58. Because expressing remorse requires some admission of guilt, we reasoned that it would be incongruous to penalize a defendant for not accepting responsibility for a crime of which he believes he is innocent. *Id.* at 757. We went on, however, to specifically limit our holding "to situations where a defendant maintains his innocence throughout the criminal process and risks incriminating himself if he expresses remorse at sentencing." *Id.* at 760. Where a defendant has made some admission of guilt, an inference from his silence at sentencing would not violate the privilege against self-incrimination. *Id.* Thus, "[t]he sentencing judge may legitimately consider a defendant's lack of feeling about killing a fellow human being, when the defendant admits to the killing." *Id.* at 761 (quotation omitted).

Here, the defendant read a statement at the sentencing hearing. Part of that statement read:

> I can only imagine the pain you guys have been through. I had to learn how to walk again in jail, but I also have to live with the fact that innocent people died due to poor decisions. I don't expect anyone to forgive, but I just want you to understand I'm not heartless, I'm not a monster and it was an accident. So for what it's worth I'm very sorry that this had to happen.

The defendant therefore admitted that his decisions led to death and injury, although he maintained that it was an accident. In light of the defendant's admission of his actions, the trial court acted within its discretion to

conclude that he lacked remorse based in part upon his preoccupation with showering after listening to "grueling" testimony concerning the accident. *See Burgess*, 156 N.H. at 761.

Moreover, even if we were to assume that there was an error, and that the error was plain, the defendant is unable to prove that the error affected substantial rights. As the trial court explained, other factors also supported the conclusion that he lacked remorse. Before imposing the sentence, the trial court stated:

> [I]n sum, we have one woman dead, one baby dead, we have one woman grievously injured and one man who is brain damaged. We have a significant criminal record, a significant motor vehicle record. We have five aggravating factors as outlined by the State and no mitigating factors, and we have zero remorse, and for those reasons the math adds up . . . to the sentence recommended in the PSI.

Given the other considerations meriting a severe sentence, the defendant has provided nothing to show that the error seriously affected the fairness, integrity or outcome of the proceeding. *See United States v. Olano*, 507 U.S. 725, 734-35 (1993); *State v. Emery*, 152 N.H. 783, 787 (2005).

IV

In conclusion, we reverse the defendant's manslaughter and negligent homicide convictions pertaining to the death of D.E., and remand this case for further proceedings consistent with this opinion. The remaining convictions and sentences are affirmed.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.