Rockingham
No. 2009-449

THE STATE OF NEW HAMPSHIRE

v.

ROBIN KNIGHT

Argued: October 14, 2010
Opinion Issued: January 13, 2011

*Michael A. Delaney*, attorney general (*Michael S. Lewis*, assistant attorney general, on the brief and orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Robin Knight, appeals his conviction on one count of accomplice to first degree murder, *see* RSA 626:8, III(a) (2007); RSA 630:1-a, I(a) (2007), and one count of conspiracy to commit murder, *see* RSA 629:3, I, IV (2007); RSA 630:1, I(b)-(c) (2007). He argues that the Trial Court (*Nadeau*, J.) erred when it denied his motion to suppress testimony from a jailhouse informant and when it denied his request for a jury instruction on the credibility of informant testimony. We affirm.

In September 2003, John Brooks loaded two motorcycles into a trailer in order to move them from a storage facility in Manchester. The next day, Brooks discovered that the trailer had been stolen and suspected that Jack Reid, a handyman he had hired to help him pack, had committed the theft. In 2005, Brooks planned to kill Reid. He recruited Michael Benton, Joseph Vrooman, and the defendant to assist him.

Brooks's plan involved luring Reid to a farmhouse in Deerfield, where Brooks would question Reid about the stolen items and one of the four men would smother Reid to death with Saran Wrap. The job of luring Reid to the farmhouse fell to the defendant. The defendant made a series of phone calls to Reid, and set up a date and a time for Reid to come to the farmhouse. To ensure that Reid would come alone, the defendant told him that he was going through a divorce and needed to save money on labor.

In preparation for the confrontation with Reid, the defendant, Brooks, and Vrooman bought zipties, a tarp, gloves, trash bags, and duct tape. The defendant discussed how to kill Reid and suggested using Saran Wrap to smother him. The defendant also discussed plans for disposing of Reid's body after he was killed, and later drove around on the day of the murder looking for places to dump Reid's body.

On June 27, 2005, Reid arrived alone at the farmhouse in Deerfield. The defendant and Vrooman led him into the farmhouse and down a corridor, toward a closet where Benton was waiting. When Reid reached the end of the corridor, Vrooman pushed Reid into the closet toward Benton. Vrooman then tackled Reid to prevent him from escaping and Benton began beating Reid in the head with a sledgehammer. When Benton stopped the beating and began to walk away, the defendant and Vrooman noticed that Reid was still breathing and instructed Benton to return. Benton went back into the closet and again hit Reid in the head with the sledgehammer.

Reid's body was dragged to the center of the barn and the defendant and Vrooman attempted to contain the bleeding. The defendant handed Saran Wrap to Vrooman, who then attempted to wrap it around Reid's head. When this failed to contain the blood, the defendant gave Vrooman a plastic

tarp to wrap around Reid's head. Reid was still bleeding, so Brooks struck Reid in the chest with the sledgehammer several times, finally killing him, stating "stop the heart, stop the bleeding."

The four men then wrapped Reid's body in plastic and duct tape and put his body in the back of Reid's pickup truck. The men covered Reid's body with rocks and brush. The defendant and Vrooman drove Reid's truck with the body in the bed of the truck to Massachusetts, while Brooks and Benton followed in Brooks's minivan. The defendant navigated a route to avoid tolls so as to avoid detection. Once in Massachusetts, the defendant and Vrooman agreed to leave the truck and the body in a Target parking lot in Saugus.

In the days following the killing, the defendant, Brooks, and Vrooman returned to the farmhouse to clean up evidence of the murder. The defendant and Vrooman ripped out and replaced the walls and flooring of the closet where Reid was attacked. The men took the wood that they had ripped out to Bert Seaver's home to put in his burn pile. The men also briefly considered moving Reid's body from the Target parking lot, but had disposed of the truck's keys and did not want to risk "hotwiring" the truck in broad daylight where cameras might be present.

Following the murder and clean up, the defendant, Brooks, and Vrooman flew to Las Vegas. On July 5, 2005, Reid's body was found in the bed of his pickup truck. Phone records, surveillance video from the Target parking lot, and evidence found in the pickup truck led the police to Benton, Brooks, Vrooman and the defendant. The defendant was arrested on November 14, 2006.

While the defendant was at the Rockingham County House of Correction, he met Henry Bellemare, another inmate. The defendant had numerous conversations with Bellemare during which he made several incriminating statements regarding Reid's murder. New Hampshire State Police Detective Robert Estabrook subsequently met with Bellemare at the jail to confirm that he was willing to cooperate with the defendant's prosecution, and conducted a full interview with him at the state police barracks on June 26, 2007.

On May 4, 2009, the day before the first day of jury selection, the defendant filed a motion to suppress Bellemare's testimony, arguing that Bellemare was an agent of the State when he was speaking with the defendant and thus the State violated the defendant's right to counsel. A hearing on the motion was held the day before the trial was scheduled to begin. The trial court denied the defendant's motion as untimely and allowed Bellemare to testify.

On appeal the defendant makes two arguments. First, he contends that he had "good cause" for his late filing of the motion to suppress and that the

trial court's remedy of summarily denying the motion was too extreme a sanction. Second, he argues that the trial court unsustainably exercised its discretion in denying his request for a jury instruction on the credibility of informant testimony.

With respect to his first issue, the defendant argues that he was not aware of the possible constitutional issues regarding Bellemare until after Bellemare was deposed on May 1, 2009. The State counters that the defendant was provided with details of interviews conducted with Bellemare more than a year before the motion to suppress was filed, as well as letters from attorneys representing both Bellemare and the State, and thus he was provided with more than enough notice of any potential suppression issues.

Parties must file motions to suppress "not less than forty-five (45) calendar days prior to the scheduled jury selection date or within such other time in advance of trial as the Court may order for good cause shown or may provide for in a pretrial scheduling order." SUPER. CT. R. 98(F). Here, the trial court set a deadline of March 2, 2009, for all dispositive motions and all motions other than motions *in limine*. The defendant's motion was not filed until May 4, 2009. "If at any time during the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may take such action as it deems just under the circumstances . . . ." SUPER. CT. R. 98(J). We review the trial court's decision to deny a motion to suppress as untimely for an unsustainable exercise of discretion. *See State v. Prisby*, 131 N.H. 57, 60 (1988).

While the trial court may act upon an untimely motion to suppress as a matter of discretion, "defendants are not entitled to assume that a judge will exercise discretion to entertain such a motion at the eleventh hour." *Id.* at 58. "Courts have a legitimate interest in the enforcement of scheduling deadlines, both to manage a pending case and to retain the credibility of these deadlines in future cases." *United States v. Trobee*, 551 F.3d 835, 838 (8th Cir.), *cert. denied*, 130 S. Ct. 279 (2009); *see also State v. Baker*, 127 N.H. 801, 804 (1986) ("The way to force an accommodation of sound judicial management with constitutionally mandated procedure is to issue and enforce scheduling rules or orders, with provisions for sanctions against counsel who violate their terms.").

In *State v. Cromlish*, 146 N.H. 277 (2001), we upheld the trial court's denial of a defendant's motion for services other than counsel filed on the eve of trial. There, we noted that

> [a]ny further delay would have required the court to repeat the work necessary to call up and choose another jury as well as

adjust its calendar to accommodate the continuance. Furthermore, a continuance on the eve of trial would have required the State and local law enforcement authorities to commit additional resources to repeat trial preparation at a later date. Additionally, the burden on these resources if such last minute continuances were routinely granted would hamper the State's overall ability to pursue the orderly administration of justice.

*Id.* at 282.

In this case, the trial court determined that the defendant received taped interviews between Bellemare and Sergeant Estabrook that included details of the conversations between the defendant and Bellemare. In addition to the taped interviews, the trial court found that the defendant received reports about two other interviews with Bellemare as well as letters from attorneys representing Bellemare and the State "specifically flagging the Sixth Amendment potential issue." The trial court determined that the defendant had more than enough discovery to file a motion to suppress before the deadline set by the scheduling order.

Moreover, the motion was filed more than two months after the deadline set by the scheduling order and was not heard until the day before the trial was to commence. The trial judge is in the best position to determine what is required to ensure the orderly administration of justice. In this case, the judge found that the defendant did not show good cause for the delay, and, because of the impending trial, properly exercised discretion in denying the suppression motion. *See Cromlish*, 146 N.H. at 282.

The defendant next argues that the trial court unsustainably exercised its discretion by refusing his request for a special jury instruction regarding Bellemare's credibility. The trial court denied the defendant's request, finding that a specific instruction would constitute an improper comment about the evidence.

"Whether or not a particular jury instruction is necessary, and the scope and wording of the instruction, is within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." *State v. Kousounadis*, 159 N.H. 413, 422-23 (2009) (quotation omitted). Rather than the specific instruction on Bellemare's credibility, the court gave the following general credibility charge:

In deciding which witnesses to believe, you should obviously use your own personal experiences and your common sense. And let me suggest that you consider a number of other factors: whether the witness appeared to be candid; whether the witness appeared

worthy of belief; the appearance, attitude, and demeanor of the witness while testifying; the witness' age, intelligence, and experience; the accuracy of the witness' memory; whether the witness had an interest in the outcome of the case; whether the witness had any reason for not telling the truth; whether what the witness said seemed reasonable or probable; whether what the witness said seemed unreasonable or inconsistent with other evidence in the case or with prior statements made by the witness; and whether the witness had any friendship or animosity toward other people involved in the case.

In addition to this general credibility instruction, the court also gave an instruction on testimony of accomplices cooperating with the State. The court charged the jury to consider

whether the testimony of these witnesses has been affected by the immunity they have been granted or by the agreements they have struck with the State, by the sentence, if any, they expect to receive, by their own self-interest in the outcome of this case, or by any prejudice such witness may have either for or against the State or the Defendant.

█ The defendant would have us set forth a categorical rule requiring a cautionary instruction to be given whenever informants testify. "Categorical imperatives established by appellate judges in advance and imposed on trial judges are entirely inappropriate in [this situation]." *United States v. Cook*, 102 F.3d 249, 255 (7th Cir. 1996) (Ripple, J., concurring). The trial judge is in the best position to make the prudential judgment as to whether a particular instruction should be given. We have long recognized that the decision to give a particular instruction concerning the testimony of witnesses and the wording of that instruction are within the sound discretion of the trial court.

█ In this case, defense counsel had an opportunity to cross-examine Bellemare and highlight any potential motives or biases that he may have had. The trial judge chose to give a general credibility instruction, providing a number of factors for jurors to consider when assessing the weight of each witness's testimony. In addition, the court gave an instruction highlighting the need for jurors to scrutinize those witnesses cooperating with the State and their possible ulterior motives. We cannot say that the choice to give the general credibility instruction, which highlighted certain specific factors for jurors to consider, rather than the defendant's

requested informant instruction, was "beyond the range of options from which one would expect a trial judge to select in such a situation." *Id.* at 256 (Ripple, J., concurring).

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.