Rockingham
No. 2008-875

THE STATE OF NEW HAMPSHIRE

v.

JOHN BROOKS

Argued: February 16, 2012
Opinion Issued: October 30, 2012

274

*Michael A. Delaney*, attorney general (*Janice K. Rundles*, senior assistant attorney general, on the brief and orally), for the State.

*Hinckley, Allen & Snyder LLP*, of Concord (*Christopher H.M. Carter* and *Danielle L. Pacik* on the brief), and *Foley Hoag LLP*, of Boston, Massachusetts (*Martin F. Murphy* on the brief and orally), for the defendant.

CONBOY, J. The defendant, John Brooks, appeals his conviction, following a jury trial, for capital murder involving solicitation, capital murder in the course of a kidnapping, first degree murder (as an accomplice), and

conspiracy to commit capital murder, in connection with the death of Jack Reid, Sr. *See* RSA 630:1, I(b), (c) (1996) (amended 2006, 2011); RSA 630:5 (1996); RSA 626:8 (Supp. 2004); RSA 630:1-a, I(a) (1996); RSA 629:3 (Supp. 2004). On appeal, he argues that the Superior Court (*Lynn*, C.J.) erred by: (1) permitting the State to authenticate documents by use of affidavits, rather than live testimony, in violation of his rights under the State and Federal Constitutions; (2) permitting an FBI agent to testify that the defendant's account may have been untruthful; (3) permitting the State to introduce a new opinion from the medical examiner during the trial; (4) failing to instruct the jury that it must determine the "predominating cause" of death, pursuant to *State v. Seymour*, 140 N.H. 736 (1996); (5) failing to instruct the jury that the solicitation variant of capital murder requires a finding that the defendant acted for his personal pecuniary gain; and (6) failing to instruct the jury that the kidnapping variant of capital murder requires a finding that the defendant intended to confine Reid to commit a crime other than murder. We affirm.

## *I. Facts*

The jury could have found the following facts. *See State v. Knight*, 161 N.H. 338 (2011) (related proceeding). In September 2003, the Brooks family's belongings were stolen from a rental truck and trailer, which the family had loaded in preparation for their move from New Hampshire to Las Vegas. Although the Brookses suspected Jack Reid of the theft, they agreed not to give his name to the police; instead, the defendant told two friends of his son, Jesse — Andrew Carter and Michael Benton — that he wanted their help to kill Reid. He met with Carter and Benton over the next several months to discuss how to "take care of" Reid, including possibly kidnapping him so that the defendant could find out the location of his property, and ultimately killing him. The defendant assured Carter and Benton that they would be "taken care of" if they helped him, and they were initially paid $5,000. However, their attempts on Reid's life in 2003 were unsuccessful. The defendant and Carter continued to discuss killing Reid into the fall of 2004.

In August 2004, the defendant, his wife Lorraine, and Jesse went to the Portsmouth office of the Federal Bureau of Investigation, where they reported their suspicions regarding Reid and provided Special Agent Laura Hanlon a written chronology of events that concerned them.

At some point, the defendant became acquainted with Joseph Vrooman and Robin Knight in Las Vegas. Sometime after June 10, 2005, he offered Vrooman $10,000 to help him kill Reid, and Vrooman agreed. The defendant and Vrooman then met at the defendant's Las Vegas home, joined by Jesse.

They discussed obtaining a telephone with which to lure Reid to the property of Michael Connors, another New Hampshire acquaintance, and obtaining handcuffs, pepper spray, and a stun gun with which to subdue Reid. After this meeting, Vrooman obtained the handcuffs, pepper spray, and stun gun and brought them to the defendant's Las Vegas home, where they packaged the supplies and sent them to Connors in New Hampshire. On June 18, 2005, the defendant and Vrooman flew to New Hampshire, where Connors picked them up at the airport, bearing the unopened package of supplies as the defendant had instructed.

The next day, the defendant and Vrooman met Benton in Manchester. The defendant paid for Benton to purchase a prepaid cellular telephone with which to call Reid; Benton activated the telephone using the name "Charlie Was." They then drove to Connors's home. Although Connors told the defendant he did not want him to use his property, Vrooman testified that the defendant told him and Benton that they could use Connors's place.

Over the next week, the defendant and Vrooman, joined by Knight, purchased more supplies — a large black plastic tarp, duct tape, garbage bags, zip-ties, Saran Wrap, and gloves. They decided that Vrooman, Knight, and Benton would subdue Reid, and the defendant would be armed with his .22 caliber handgun in case anything went wrong.

On June 27, 2005, the date they had set for Reid to come to Connors's property for a fictitious job, the defendant, Vrooman, Benton, and Knight drove to the property. Once there, Benton testified, the defendant stated that he wanted Reid to know that "it's me that's doing this to him." To this end, they decided that they would confine Reid in a small closet area in the home's attached barn, after which the defendant would confront him and they would suffocate him using the Saran Wrap. However, Benton found a sledgehammer in the barn, so the plan became that Vrooman would push Reid into the closet, where Benton would hit him with the sledgehammer.

When Reid arrived at Connors's house, the defendant and Benton hid in the barn. Knight and Vrooman greeted Reid and led him down a hallway into the barn. After Vrooman pushed Reid into the closet, Benton hit him on the side of the head with the sledgehammer. Knight told Benton that Reid was not yet dead, and Benton struck two or three additional blows to Reid's forehead with the sledgehammer. Knight, Vrooman, and the defendant carried Reid, still breathing, from the closet to the black plastic tarp, which had been laid out on the barn floor. As Knight and Benton tried to clean up the blood, Vrooman told the defendant that Reid would not stop bleeding. Vrooman testified that the defendant said, "[S]top the heart, stop the bleeding," and struck Reid two or three times in the chest with the

sledgehammer. The four men then emptied Reid's pockets, wrapped his body in the tarp, carried it out to the back of Reid's dump truck, and covered it with branches and rocks.

Vrooman and Knight drove Reid's truck to Massachusetts and left it in a Target Store parking lot. The defendant gave Benton $5,000. After returning to New Hampshire, the defendant and Vrooman threw the sledgehammer, handcuffs, and Reid's watch into a nearby river. They stopped by the home of Bert Seaver, a friend of the defendant, where they disposed of evidence. The following day, the defendant, Vrooman, and Knight returned to Connors's barn and replaced the walls and floor of the closet area where Reid had been killed.

On July 1, 2005, the defendant, Vrooman, and Knight returned to Las Vegas. There, the defendant paid Vrooman $2,500 in cash; over the next few months, Vrooman received an additional $10,000 from the defendant and Jesse. Vrooman was told that Knight had also been paid. In late July, the defendant sent Benton another $400 through Western Union. In early August, Benton telephoned Jesse to ask for more money so he could travel to Las Vegas, and received another $800 through Western Union.

*II. Confrontation Clause*

At trial, the State introduced extensive documentary evidence, including telephone records, air travel records, insurance company records, Federal Express records, and Western Union records, as business records under New Hampshire Rule of Evidence 803(6), and authenticated the records through certifications from the records' custodians pursuant to New Hampshire Rule of Evidence 902(11). The defendant argues that allowing the records to be so authenticated violated his rights under the Sixth Amendment's Confrontation Clause and the New Hampshire Constitution. He challenges the trial court's ruling that the certifications of authenticity pursuant to Rule 902(11) were not testimonial, arguing that "the custodian affidavits did far more than 'authenticate' records as genuine copies of originals in the custodian's possession."

We review the defendant's Confrontation Clause challenges *de novo. See United States v. Yeley-Davis*, 632 F.3d 673, 678 (10th Cir. 2011), *cert. denied*, 131 S. Ct. 2172 (2011). Because the defendant has raised his claim under both the State and Federal Constitutions, we would normally address his State claim first. *See State v. Ayer*, 154 N.H. 500, 504 (2006). However, the defendant's arguments center upon his rights under the Federal Constitution: he contends that admitting the records through affidavits, rather than live testimony, was contrary to *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny, *Melendez-Diaz v. Massachu-*

*setts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011). We will therefore first address his claim under the Federal Constitution.

■ The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Fourteenth Amendment renders the Confrontation Clause binding on the States. *See Michigan v. Bryant*, 131 S. Ct. 1143, 1152 (2011). Only "testimonial statements" cause a declarant to be a "witness" within the meaning of the Confrontation Clause. *Davis v. Washington*, 547 U.S. 813, 821 (2006) (quotations omitted). A witness is a person who "bear[s] testimony." *Crawford*, 541 U.S. at 51 (quotation omitted). "Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (quotations and brackets omitted).

■ "The crucial determination under *Crawford* as to whether an out-of-court statement violates the Confrontation Clause is whether it is 'testimonial' or not." *State v. O'Maley*, 156 N.H. 125, 131 (2007), *overruled in part by Melendez-Diaz*, 557 U.S. at 312-20; *see also United States v. Mallory*, 461 Fed. Appx. 352, 356 (4th Cir. 2012) ("the right of confrontation covers all testimonial statements that declarants would reasonably expect to be used prosecutorily" (quotation omitted)). "To be considered testimonial, the primary purpose of the statement must be 'to establish or prove past events potentially relevant to later criminal prosecution.'" *Mallory*, 461 Fed. Appx. at 356 (quoting *Davis*, 547 U.S. at 822).

■ "Business records are generally admissible, even without confrontation." *Id.*; *see Bullcoming*, 131 S. Ct. at 2714 n.6. "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial." *Melendez-Diaz*, 557 U.S. at 324. Statements that qualify as business records are not, however, nontestimonial *per se. See O'Maley*, 156 N.H. at 135. "Accordingly, under *Melendez-Diaz*, the relevant question in determining whether a business record is testimonial is whether it was created for the administration of an entity's affairs or for the purpose of establishing or proving some fact at trial." *United States v. Hudson*, 2011 U.S. Dist. LEXIS 126830, at *12 (E.D. La. 2011). "If the primary purpose of creating the record is not to prove a fact at trial, the admissibility of the records is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* (quotation, brackets, and emphasis omitted).

██Although the defendant argues that the State should have presented live testimony regarding the requirements of the business records rule, he conceded at oral argument that if the records had been sponsored by a live witness who gave testimony establishing that they were business records, nearly all of the records admitted in the case would not be testimonial. He contends, however, that some of the telephone records "were not records . . . that were maintained in the ordinary course of business by the phone company." We disagree. The defendant's argument relies upon the testimony of a witness who explained that the telephone records that were not billing records were nonetheless part of the telephone company's record system. *See Yeley-Davis*, 632 F.3d at 679 (finding that, although certain telephone records were not telephone bills, "[t]his does not mean . . . that these records were created simply for litigation — they were not. Rather, these records were kept for [the telephone company's] business purposes" and, therefore, were not testimonial). Because all of the telephone records, including the records that would not normally be provided to a subscriber, were "created for the administration of [the] entity's affairs and not for the purpose of establishing or proving some fact at trial," *Melendez-Diaz*, 557 U.S. at 324, they are not testimonial. *See Mallory*, 461 Fed. Appx. at 356 (FedEx record); *Hudson*, 2011 U.S. Dist. LEXIS 126830, at *12-*13 (telephone and financial records).

Unlike the records themselves, however, the certifications of the business records were created for the sole purpose of litigation — that is, to authenticate documents pursuant to Rule 902(11). *See Hudson*, 2011 U.S. Dist. LEXIS 126830, at *13-*14 (noting that business record certifications pursuant to Federal Rule of Evidence 902(11) could be described as affidavits prepared for litigation purposes); *United States v. Hemphill*, 514 F.3d 1350, 1358-59 n.2 (D.C. Cir. 2008) (same). Thus, we turn to the question of whether admission of the certifications violated the defendant's Confrontation Clause rights.

██ ██We note first that the defendant does not challenge the certifications' compliance with Rule 902(11). Rather, he challenges Rule 902(11)'s authentication procedure as incompatible with his confrontation rights. The Supreme Court, however, has distinguished an affidavit that is created for the purpose of providing evidence against a defendant (to which the right of confrontation would apply) from an affidavit merely authenticating an admissible record (an exception to confrontation requirements). *See Melendez-Diaz*, 557 U.S. at 322-23. It stated, "A clerk could by affidavit *authenticate* or provide a copy of an otherwise admissible record, but could not . . . *create* a record for the sole purpose of providing evidence against a defendant." *Id*. Certifications under Rule 902(11) "are authentications of

otherwise admissible records and do not themselves create new records. Accordingly, they are nontestimonial." *Hudson*, 2011 U.S. Dist. LEXIS 126830, at *16. "Consequently, *Melendez-Diaz* makes clear that the Sixth Amendment right to confront witnesses does not include the right to confront a records custodian who submits a Rule 902(11) certification of a record that was created in the course of a regularly conducted business activity." *Mallory*, 461 Fed. Appx. at 357; *see United States v. Fajardo-Guevara*, 2011 WL 6003840, at *2 n.1 (M.D. La. 2011) ("902(11) certifications are nontestimonial and do not implicate the Confrontation Clause").

The defendant insists that "the custodian affidavits did far more than 'authenticate' records as genuine copies of originals in the custodian's possession." He points out that an affidavit merely verifying that the records were true copies of those in the business's file would not suffice to authenticate the documents as business records. *See United States v. Weiland*, 420 F.3d 1062, 1076 n.13 (9th Cir. 2005) ("Unlike public records admitted under Rule 803(8), records of a regularly conducted activity admitted under Rule 803(6) require additional foundation."). Indeed, Rule 902(11) provides that authentication requires the custodian or another qualified person to certify under oath that the record: (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (B) was kept in the course of the regularly conducted activity; and (C) was made by the regularly conducted activity as a regular practice. N.H. R. Ev. 902(11). Thus, the defendant argues, Rule 902(11) certifications provide "testimony about who made the records . . . and how the records were made," like the affidavits involved in *Melendez-Diaz*.

▮ We agree with the courts that have ruled that Rule 902(11) certifications are distinguishable from the certificates at issue in *Melendez-Diaz*. *See Hudson*, 2011 U.S. Dist. LEXIS 126830, at *16-*17 n.5 ("Although a 902(11) certification goes beyond a simple statement that the record in issue is a record of the business in question, none of the courts to address the issue has found this to be an impediment to the use of these certifications under the Confrontation Clause."). The evidence at issue in *Melendez-Diaz* consisted of "three 'certificates of analysis,' . . . sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health," reporting the weight of bags of material seized by the police and stating that the bags "[had] been examined with the following results: The substance was found to contain: Cocaine." *Melendez-Diaz*, 557 U.S. at 308 (quotations omitted). In *Melendez-Diaz*, "not only were the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the

statement would be available for use at a later trial,' but under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." *Melendez-Diaz*, 557 U.S. at 311 (quoting *Crawford*, 541 U.S. at 52 & Mass. Gen. Laws, ch. 111, § 13).

█ The certifications in this case, however, served only as the foundation for the admission of the substantive evidence. The certifications themselves had minimal evidentiary value. *See United States v. Kos*, 2008 WL 5084006, at *3 (W.D.N.C. 2008) ("a business record certification does not serve independently as evidence in the case; rather, it serves merely to lay a foundation for the admission of business records" (quotations, brackets and ellipsis omitted)). Thus, we conclude that the admission of the records and the certifications did not violate the defendant's confrontation rights under the Federal Constitution.

█ The defendant argues that "[t]he New Hampshire right must be at least as extensive as the Confrontation Clause rights described in *Crawford, Melendez-Diaz*, and *Bullcoming*; however, given the greater precision of the New Hampshire Constitution, it should be interpreted as more expansive." "We have not, however, adopted the *Crawford* analysis as applicable in this State." *State v. Munoz*, 157 N.H. 143, 148 (2008). The defendant's assertion that the New Hampshire Constitution's Confrontation Clause protection is more expansive than the *Crawford* rule relies entirely upon our observation in *State v. Peters*, 133 N.H. 791, 794 (1991), that "[t]he language of the New Hampshire Constitution['s Confrontation Clause] is the more precise of the two, in that it explicitly provides what the Federal Constitution has been interpreted to mean." The defendant, however, does not offer argument under any standard other than the federal standard regarding the violation of his rights under the State Constitution, *see Munoz*, 157 N.H. at 148. Neither does he address the applicability of the Confrontation Clause test we have adopted — namely, that of *Ohio v. Roberts*, 448 U.S. 56 (1980). *See State v. Ata*, 158 N.H. 406, 409 (2009); *Ayer*, 154 N.H. at 511. We will not consider the admissibility of the records and their certifications under a standard the defendant has not argued. *See Munoz*, 157 N.H. at 148. Accordingly, we conclude that the defendant has not established that admitting the records by means of custodians' affidavits rather than live testimony violated his rights under Part I, Article 15 of the New Hampshire Constitution.

## II. FBI Agent's Opinion

The defendant next argues that the trial court erred by permitting the State to elicit the opinion of FBI Special Agent Hanlon that her conversa-

tion with the Brooks family was "peculiar and kind of odd," and that "parts of the stories that [the Brookses] were telling [her] seemed not only odd, but perhaps didn't have a full ring of truth to it." He first argues that the opinion testimony was not relevant because Lorraine Brooks's extensive testimony about her visit to the FBI was admitted only as evidence of the defendant's intent, and not for the truth of the matters stated during the discussion with Hanlon. Second, he asserts that "the admission of this evidence violated the cardinal rule that a trial judge should not permit the prosecution to ask a witness to express an opinion about the credibility of another witness." *See State v. Lopez*, 156 N.H. 416, 423-24 (2007) (adopting a broad prohibition on questions requiring a witness to comment on credibility of other witnesses).

 "We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard and reverse only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case." *State v. Wamala*, 158 N.H. 583, 586 (2009). We have held that "requiring a witness to opine upon the credibility of other witnesses is error because such questioning interferes with the jury's obligation to determine the credibility of witnesses." *Lopez*, 156 N.H. at 423. We have also declined to create an exception to *Lopez*'s "broad prohibition on questions requiring a witness to comment upon the credibility of other witnesses." *State v. Parker*, 160 N.H. 203, 213 (2010) (quotation omitted). Thus, although Hanlon testified as to her impression of the veracity of a prior report by the Brookses rather than of a witness's trial testimony, we conclude that the trial court erred in allowing her to do so.

The State argues that any error in admitting the testimony was harmless. The State bears the burden of proving that an error is harmless. *State v. Pseudae*, 154 N.H. 196, 202 (2006). An error is harmless only if it is determined, beyond a reasonable doubt, that the verdict was not affected by the error. *Id.* An error may be harmless if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *Id.* In determining whether an error was harmless, we consider the alternative evidence of guilt presented at trial as well as the character of the inadmissible evidence. *See id.*

We conclude that the State has established beyond a reasonable doubt that the verdict was not affected by the admission of Hanlon's opinion. The evidence of the defendant's guilt is overwhelming. Benton testified that the defendant wanted Reid killed, offered money to have him killed, engaged in numerous discussions about how to carry out the plan, and ultimately

participated with him in the murder of Reid. Vrooman testified that the defendant recruited him in 2005 to help kill Reid and offered him money to do so, and corroborated Benton's testimony that the defendant participated in the killing of Reid. His testimony about the planning and purchasing of supplies to further the plot, and about the events surrounding the murder itself, corroborated Benton's testimony. Vrooman's and Benton's testimony about meetings before the murder, supplies gathered with which to commit the murder, and the destruction of evidence after the murder was corroborated by Connors, Seaver, and Lorraine Brooks. Connors also testified about the defendant's intention to lure Reid to his property and kill him.

Benton's and Vrooman's testimony about the specific location where Reid was killed, how he was killed, and what was done with his body was corroborated by a forensic examination of the body, by physical evidence gathered at the scene of the murder and from the river near the defendant's home, and by DNA analysis.

Testimony indicated that the June 27, 2005 surveillance video from the Target store where Reid's dump truck had been left showed two men leave Reid's truck and get into a 2004 or 2005 gold or tan Toyota Sienna mini-van. Motor vehicle records showed that the defendant owned a beige 2004 Toyota Sienna mini-van. Testimony established that a videotape from a Waste Management facility in Londonderry showed Reid alive at 2:13 p.m. on June 27. Reid's telephone records showed that the last call he made that day was to the number associated with "Charlie Was." When the records pertaining to this number were retrieved, it was found to be the number of a pre-paid cellular telephone activated June 19, 2005, in the name of "Charlie Was." The only call shown by the records of the "Charlie Was" telephone that was not to Reid was a call placed to the telephone from a landline in the defendant's name from a home he owned in Derry.

The logbook removed from Reid's truck listed on the pages dated June 27-28 the name "Charlie," the number of the "Charlie Was" telephone, and Connors's address. In late July 2005, police visited Connors's home to speak with him and learned of other potential witnesses. The police then obtained flight records showing that the defendant had traveled from Manchester, New Hampshire, to Las Vegas, Nevada, on July 1, 2005, with Joseph Vrooman and Robin Knight.

In December 2006, two halves of a pair of handcuffs were recovered from the river, corroborating Vrooman's statement that the handcuffs he and the defendant had mailed from Las Vegas had been thrown into the river. Also in December 2006, State Police executed a search warrant in Connors's barn and found that, while it appeared that the walls and floor of the closet had been replaced, the ceiling had not, and it contained a small spatter of

blood later identified as being consistent with Reid's. Luminol testing revealed blood smears leading from the hallway outside the closet to an open area in the barn, and later examination of the floorboards confirmed the presence of blood consistent with that of Reid.

Benton's and Vrooman's testimony about the purchase of the telephone with which to contact Reid was corroborated by records of that purchase. Telephone records corroborated Benton's, Carter's, and Vrooman's testimony about telephone contacts among the conspirators at pertinent times. Federal Express records corroborated testimony by Connors, Benton, and Vrooman about a package of supplies sent from Las Vegas to New Hampshire. Airline records corroborated testimony by Connors, Vrooman, and Lorraine Brooks about relevant air travel. Western Union records corroborated Benton's testimony about receiving money from the defendant and Jesse. Benton's testimony that some of those funds were used to travel to Las Vegas was corroborated by Vrooman's and Lorraine Brooks's confirmation that he was visiting there at the relevant time.

In addition to the overwhelming nature of the alternative evidence of the defendant's guilt, we consider the character of the inadmissible evidence to determine whether it "is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt." *Id.* Here, Hanlon's opinion was inconsequential. The conversation between the Brooks family and the FBI was not admitted for the truth of the Brookses' statements, but rather to show that the defendant's actions were inconsistent with a longstanding plan to commit murder. The trial court allowed Lorraine Brooks to testify, over the State's hearsay objection, to the entire content of the family's discussion with Hanlon, reasoning that the testimony was admissible "because it undermines the theory of a conspiracy because . . . a jury could find people who are involved in a conspiracy are not likely to provide their identities to a law enforcement agency that may be — you know, at some point may be charged with investigating them." The purpose for which the defense proffered the evidence — to show that the defendant presented himself to the FBI and provided the names of Benton and Carter — was thus met, regardless of Hanlon's opinion of the Brooks family's account. Thus, despite the error, any prejudice caused by admission of Hanlon's opinion was minimal, and inconsequential in light of the strength of the State's evidence of guilt.

Because the evidence of the defendant's guilt was overwhelming, the admission of Hanlon's opinion regarding the Brookses' statements was harmless beyond a reasonable doubt.

*III. Medical Examiner's Opinion*

The defendant next argues that the trial court erred by permitting the State to introduce a new opinion from the medical examiner during the trial. He contends first that the trial court erred by applying former Superior Court Rule 98, rather than the version in effect at the time of trial. Second, he argues that the court unsustainably exercised its discretion in finding that he was not prejudiced by admission of the opinion evidence.

Pursuant to Rule 98, the State timely disclosed, as its cause-of-death expert, Dr. Richard Evans, the Massachusetts medical examiner who conducted Reid's autopsy. The State produced Dr. Evans's autopsy report and death certificate, which described the cause of Reid's death as "homicidal violence of undetermined etiology with evaluation complicated by multiple perimortem fractures, body discovered wrapped in plastic and severe postmortem putrefaction." At trial, the State informed the trial court that at Dr. Evans's deposition, available to both parties, "he testified extensively that the nature of the chest injuries was such that he couldn't tell specifically why they had been inflicted or how but rather that they were blunt force trauma injuries." The defense opening statement employed Dr. Evans's anticipated testimony as a tool to attack the credibility of Vrooman's account of the murder, casting Dr. Evans's evaluation of the victim's rib injuries as inconsistent with Vrooman's anticipated testimony that the defendant struck Reid in the chest with a sledgehammer.

On the day that Dr. Evans was scheduled to testify, counsel for the State notified defense counsel by e-mail as follows:

> It is my recollection that during a recent conversation with Dr. Richard Evans, he informed me that he believes that at the time of the autopsy, he was informed that rocks were found in the vicinity of the body and it was suggested to him that rocks might have been on top of the body prior to its discovery.

Before Dr. Evans took the stand, defense counsel asked the trial court to exclude any opinion from Dr. Evans that had not been previously disclosed. The State countered that there was no new or undisclosed opinion, since the only testimony the State planned to elicit from Dr. Evans, outside of that contained in the disclosed reports, was "[e]ssentially just that rocks are capable of inflicting blunt force trauma." The trial court allowed the State to question Dr. Evans about the potential contribution of rocks to the "blunt force trauma" originally disclosed, reasoning: "[T]his new disclosure of the doctor is a very marginal difference. It's not something that's, you know, sort of a completely new thing." In response to the State's hypothetical question, "If someone had struck the victim in the chest several times with

[the handheld sledgehammer] . . . very close in time to when his heart stopped beating and then at some point after the victim was deceased someone tossed several rocks weighing between four and thirteen pounds onto his chest, could that cause the constellation of chest injuries you observed during the autopsy?" Dr. Evans replied, "The constellation of the two sets of events would in my opinion account for the injuries."

■■■ "We will not reverse the trial court's admission of evidence absent an unsustainable exercise of discretion." *State v. Gamester*, 149 N.H. 475, 478 (2003). "This same standard applies to review of the trial court's decision with respect to alleged discovery violations." *Id.* "To show that the trial court's exercise of discretion is unsustainable, the defendant must show that the decision was clearly unreasonable to the prejudice of his case." *State v. Dodds*, 159 N.H. 239, 248-49 (2009) (quotation omitted). "In the context of a discovery violation, actual prejudice exists if the defense has been impeded to a significant degree by the nondisclosure." *State v. Roldan*, 151 N.H. 283, 287 (2004) (quotation omitted).

The version of Rule 98 in effect at the time of trial provided, in relevant part:

> For each expert witness included on the list of witnesses, the state shall provide a brief summary of the expert's education and experience relevant to his area of expertise, state the subject matter on which the expert is expected to testify, state a summary of the facts *and opinions* to which the expert is expected to testify and a summary of the grounds for each opinion, and provide a copy of any expert report relating to such expert.

SUPER. CT. R. 98(C)(1) (emphasis added). Rule 98(H) further provided that "parties are under a continuing obligation to supplement" discovery responses as additional materials are generated or if a party learns that previously provided discovery "is incomplete, inaccurate or misleading." SUPER. CT. R. 98(H); *see also State v. Pelletier*, 149 N.H. 243, 250 (2003). By contrast, former Superior Court Rule 98 did not include the above requirements concerning expert witnesses. Rather, it merely required the State to provide the defendant copies, prior to trial, of all "results or reports of physical or mental examinations, scientific tests or experiments, or any other reports or statements of experts, as well as a summary of each expert's qualifications." SUPER. CT. R. 98(A)(2)(i) (2004). In *Gamester*, we held that former Rule 98 did not require the State to summarize the testimony of the experts whose reports the State had provided to the defense, nor did it "mandate that an expert's report contain all of the opinions regarding which the expert may be called upon to testify at trial." *State v. Lavoie*, 152 N.H. 542, 545 (2005).

The defendant first argues that "the trial court appeared to apply the law before Rule 98 was amended, and erroneously relieved the State of its obligation to disclose its expert's opinions in conformity with the current Rule." He bases this assertion on what he characterizes as the trial court's consideration of whether the State had produced the underlying *facts* that formed the basis of Dr. Evans's opinion, and the fact that, prior to the 2004 amendments, Rule 98 did not require the State to disclose "all of the *opinions* regarding which the expert may be called upon to testify at trial." *Id.* (emphasis added).

The record does not support the defendant's reading of the trial court's legal analysis. After allowing defense counsel extensive argument, the trial court attempted to determine the essence of the defendant's objection, and specifically asked whether defense counsel was being taken by surprise based upon an undisclosed *opinion.* Accordingly, we do not agree that the trial court erroneously applied the former rule.

We next turn to the defendant's argument that the trial court's exercise of discretion in allowing Dr. Evans's opinion is unsustainable. We assume, without deciding, that the admission of Dr. Evans's opinion about the possible contribution of rocks to the decedent's chest injury violated Rule 98. The defendant has nonetheless failed to demonstrate that the trial court's "decision was clearly unreasonable to the prejudice of his case." *Dodds,* 159 N.H. at 248-49 (quotation omitted).

██ ██ "Actual prejudice exists if the defense has been impeded to a significant degree by the nondisclosure." *State v. Stickney,* 148 N.H. 232, 236 (2002). Here, the nondisclosure was limited to Dr. Evans's opinion of one possible cause of the previously disclosed "blunt force trauma" — that is, the rocks that both parties had long known were found with the body. On cross-examination of Dr. Evans, the defense suggested other possible instrumentalities that might be consistent with the compressive chest injury. Dr. Evans specifically testified that he had not formulated an opinion as to whether rocks were the cause of the compressive chest injury. The tardy disclosure that the placement of rocks on Reid's body may have contributed to his chest injuries did not alter Dr. Evans's determination of the cause of death, or the evidence of the defendant's role therein. The defendant thus has not established actual prejudice as a result of the nondisclosure, or that the trial court unsustainably exercised its discretion in allowing admission of the testimony.

*IV. "Predominating Cause" Instruction*

The defendant next argues that the trial court erred by rejecting the defendant's request for a jury instruction on "predominating cause"

pursuant to *Seymour*. He asserts that, as to the murder indictments, the jury had to determine whether Reid's death was caused by Benton's blows to Reid's head or the defendant's blows to Reid's chest. Without a "predominating cause" instruction, he contends, the jury's verdict on the murder indictments may have been based upon the erroneous conclusion that the defendant's physical actions were the legal cause of Reid's death. We disagree.

One capital murder indictment charged that Brooks "did knowingly cause the death of Jack Reid, Sr., by criminally soliciting" one or more individuals "to cause his death . . . . in that, with the purpose to cause the death of Jack Reid, Sr., he offered one or more of said individuals some form of pecuniary gain in exchange for their participation in causing the death." The second capital murder indictment charged that Brooks, "acting in concert with and aided by another," knowingly caused Reid's death while engaged in an actual or attempted kidnapping, by striking Reid with a blunt object. The first-degree murder indictment likewise charged Brooks with purposely causing Reid's death by striking him with a blunt object while "acting in concert with and aided by another."

█ "Under New Hampshire law, the 'acting in concert with' language used in the indictment is ordinarily sufficient to charge a defendant as both a principal and an accomplice." *State v. Doucette*, 146 N.H. 583, 589 (2001). Where the indictments charged the defendant as both a principal and an accomplice, the State had two options for proving capital and/or first-degree murder. It could have proven that the defendant himself caused Reid's death by striking him with a blunt object. Or it could have proven accomplice liability; that is, that the defendant solicited, aided or attempted to aid another in causing Reid's death by striking him with a blunt object. *See State v. Winward*, 161 N.H. 533, 539 (2011); *see also State v. Young*, 159 N.H. 332, 340 (2009) (where defendant charged as both principal and accomplice, "evidence supporting each element of accomplice liability also would be sufficient to support the conviction[] against the defendant").

█ "The purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. O'Leary*, 153 N.H. 710, 712 (2006) (quotation omitted). "When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." *Id.* (quotation omitted). We determine whether the jury instructions adequately and accurately explained each element of the offense, bearing in mind that the scope and wording of jury instructions are within the sound discretion of the trial court. *See id.* We review the trial court's decisions on these matters

for an unsustainable exercise of discretion, and reverse only if the instructions did not fairly cover the issues of law in the case. *See id.*; *see also State v. Lamprey*, 149 N.H. 364, 366 (2003) ("Reversal of a jury verdict is unwarranted when a jury charge fairly covers the issues and law of a case.").

Before addressing the elements of the crimes with which the defendant was charged, the trial court instructed the jury "as to the principles of law that apply when more than one person is accused of being a participant in a crime." Its instructions on accomplice liability — which the defendant does not argue were erroneous — explained that "a person may be convicted of a crime even if he did not personally perform all of the conduct which constitutes the crime," and that "an accomplice is just as guilty if the crime is in fact committed as if he had personally performed each step in the commission of the crime."

The court then instructed the jury on the elements of the three alternative murder counts, each of which required the State to prove that the defendant had caused Reid's death. The instructions defined the element of "causation" as follows:

> To show that the defendant caused the death of Reid means that the State must prove beyond a reasonable doubt that the defendant's criminal conduct was a direct and substantial factor in bringing about the death of Reid. In other words, a legal cause of death is a cause without which the death would not have occurred, and a substantial factor from which the death flows — from which the death follows as a natural, direct and immediate consequence.

> To be a legal cause of death, the defendant's acts do not have to be the sole cause of death or the last acts which produce the death; rather, the State must prove beyond a reasonable doubt only that the defendant's conduct substantially and materially contributed to the death of Reid in natural and continuous sequence unbroken by superseding or intervening cause. *The State is not required to prove the manner in which or the means by which the death of Reid was caused.*

(Emphasis added). Specifically addressing accomplice liability, the court instructed the jury as to each of the three murder counts that, to find the defendant guilty, it must "find beyond a reasonable doubt that all of the elements" of the crime "were committed by one or more of the following individuals: The defendant; Robin Knight; Joseph Vrooman; and/or Michael Benton," and "that the defendant solicited, aided or attempted to aid Vrooman, Knight, and/or Benton" in the criminal activity with the requisite

intent. The defendant does not contest that the instructions accurately stated the law on accomplice liability. *See* RSA 626:8.

 The defendant's premise — that to convict Brooks on the murder indictments, the jury had to find that Reid's death was caused by Brooks's blows to Reid's chest rather than Benton's blows to Reid's head — is not supported by the indictments or the law. None of the indictments required the jury to find that the defendant himself delivered the mortal blow. As the court properly instructed the jury, the State was not required to prove the manner in which or the means by which the death of Reid was caused. Because the defendant was charged as an accomplice, the jury could have found him guilty of all three charges regardless of whether Benton's blows to Reid's head or the defendant's blows to Reid's chest were the "predominating cause" of Reid's death. Therefore, "predominating cause" language was not required to fairly cover the issues and law of this case, and reversal of the jury verdict is unwarranted. *See Lamprey*, 149 N.H. at 366.

## V. Solicitation Variant and the Requirement of "Personal Pecuniary Gain"

The defendant next argues that the trial court erred in its interpretation of RSA 630:1, I(c). He argues that the statute requires that to be convicted on the solicitation variant of capital murder, the defendant must have acted for his own pecuniary gain.

RSA 630:1, I(c) provides in pertinent part, "A person is guilty of capital murder if he knowingly causes the death of . . . [a]nother by criminally soliciting a person to cause said death or after having been criminally solicited by another for his personal pecuniary gain." The defendant argues that the statute requires proof that he acted "for his personal pecuniary gain" regardless of whether he solicited the death or was the person solicited. The State argues that only the person solicited must act for his own personal pecuniary gain.

The interpretation of a statute is a question of law, which we decide *de novo. See State v. Brown*, 155 N.H. 590, 591 (2007). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *State v. Gallagher*, 157 N.H. 421, 422 (2008). We construe the Criminal Code "according to the fair import of [its] terms and to promote justice." RSA 625:3 (2007). In doing so, we first look to the plain language of the statute to determine legislative intent. *State v. Formella*, 158 N.H. 114, 116 (2008). Absent an ambiguity, we will not look beyond the language of the statute to discern legislative intent. *Id.* "We interpret legislative intent from the statute as written and will not consider what the legislature might have said

or add language that the legislature did not see fit to include." *State v. Drake*, 155 N.H. 169, 174-75 (2007). Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. *State v. Lamy*, 158 N.H. 511, 515 (2009). Accordingly, we interpret a statute in the context of the overall statutory scheme and not in isolation. *See id.*

▮ The plain language of RSA 630:1, I(c) creates two categories: those who solicit and those who are solicited. "One established rule of statutory construction, the 'last antecedent rule,' is the general rule of statutory as well as grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation." *Mt. Valley Mall Assocs. v. Municipality of Conway*, 144 N.H. 642, 652 (2000) (quotation and citation omitted). "Therefore, qualifying phrases are to be applied to the words or phrases immediately preceding and are not to be construed as extending to others more remote." *Id.* (quotation omitted); *see also* 2A N. SINGER & J.D. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 47.33, at 487-89 (7th ed. 2007). This rule of statutory construction supports applying the qualifying phrase "for his own pecuniary gain" to only the second category, those who are solicited to kill. Further, this interpretation is logically sound in that it imposes equally severe penalties on hired killers who act for mercenary motives and those who hire them, regardless of their motivation. Accordingly, we agree with the trial court's interpretation of RSA 630:1, I(c).

▮ The defendant's argument under the rule of lenity is unavailing. "[T]he rule of lenity serves as a guide for interpreting criminal statutes where the legislature failed to articulate its intent unambiguously." *In re Alex C.*, 161 N.H. 231, 239 (2010) (quotation omitted). Because we find the legislative intent unambiguous, the rule of lenity, which forbids interpretation of a criminal statute so as to increase the statutory penalty where the legislature's intent is unclear, is inapplicable. *See id.* (legislative history to be consulted to aid statutory analysis if statute is ambiguous; if both statute and history are ambiguous, rule of lenity applies); *State v. Bailey*, 127 N.H. 811, 814 (1986) ("Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one." (quotations omitted)).

*VI. Predicate Crime Underlying Kidnapping Variant*

The defendant finally argues that the trial court erred in its interpretation of RSA 630:1, I(b). He asserts that, pursuant to the merger doctrine, to prove the kidnapping variant of capital murder, the State had to prove

that the defendant intended to confine Reid for the purpose of committing a crime other than murder. We disagree.

RSA 630:1, I(b) provides that "[a] person is guilty of capital murder if he knowingly causes the death of . . . [a]nother before, after, while engaged in the commission of, or while attempting to commit kidnapping as that offense is defined in RSA 633:1." RSA 633:1 (Supp. 2002), in turn, provides:

I. A person is guilty of kidnapping if he knowingly confines another under his control with a purpose to:

(a) Hold him for ransom or as a hostage; or

(b) Avoid apprehension by a law enforcement official; or

(c) Terrorize him or some other person; or

(d) Commit an offense against him.

The indictment charged that the defendant, "acting in concert with another or others, did knowingly confine [Reid] under his control with a purpose to terrorize him and/or to commit a crime against him," and that the defendant, in concert with others, caused Reid's death. In accordance with this language, based upon RSA 633:1, I(c) and I(d), the trial court instructed the jury that the elements of the crime included that the defendant "confined or attempted to confine Reid . . . with the conscious object or specific intent to terrorize Reid or to commit a crime against Reid," and that the defendant caused Reid's death "before, after, while engaged in, or while attempting to engage in the confinement of Reid." The court further instructed the jury that the confinement could not be merely incidental to the murder: "In other words, if you find that Reid was only confined for the purpose of killing him, and that the confinement was only expected to be a momentary or passing event before the killing occurred, then this element of the crime has not been met and you must find the defendant not guilty of this charge." In order to convict, the court instructed, the jury had to unanimously agree either:

One, that the confinement of Reid was designed to accomplish an objective in addition to or independent of the killing of Reid, namely, the terrorizing of Reid;

Or, two, that if the only objective of the confinement was to kill Reid, the confinement was contemplated or expected to last for some appreciable period of time beyond that necessary to accomplish the killing.

In response to a jury question regarding whether the predicate crime could be the murder itself, the court agreed that the murder itself could be

the purpose of the confinement, but "the evidence must establish beyond a reasonable doubt that the confinement of Reid was not merely incidental to the murder."

The merger doctrine, in this context, "prohibits a conviction for kidnapping based upon acts that fall within the definition of that crime but are merely incidental to another crime." *People v. McEathron*, 926 N.Y.S.2d 249, 251 (App. Div. 2011). The application of this doctrine presents an issue of first impression in New Hampshire. A significant majority of state courts have concluded that "the crime of kidnapping does not include conduct involving a restraint that is merely incidental to the commission of some other crime against the victim." *State v. Salamon*, 949 A.2d 1092, 1119 (Conn. 2008) (collecting cases). Despite the varying statutory language and analyses underlying these cases, "they share a common theme, namely, that it is unlikely that the legislature intended to expose an accused to a kidnapping conviction, and the severe sanctions accompanying such a conviction, when the restraint involved is merely incidental to the commission of a separate, underlying crime." *Id.* We note that a minority of jurisdictions nonetheless hold that "a kidnapping conviction may be sustained even when the restraint that forms the basis of that conviction is no greater in severity or duration than the restraint necessary to complete another crime, such as assault or robbery." *Id.* at 1108, 1119 n.30 (collecting cases). We agree with the view taken by the majority of jurisdictions, and now hold that a kidnapping conviction cannot rest on "unlawful confinements or movements incidental to the commission of other felonies." *State v. Goodhue*, 833 A.2d 861, 864 (Vt. 2003); *see also* Annotation, *Seizure or Detention for Purpose of Committing Rape, Robbery, or Other Offense as Constituting Separate Crime of Kidnapping*, 39 A.L.R.5TH 283, 361, 368 (1996) (collecting cases).

As a threshold matter, we consider the merger doctrine to apply to a capital murder charge based upon kidnapping, since the kidnapping is an element of the offense that the State must prove beyond a reasonable doubt. *See* RSA 630:1, I(b) ("[a] person is guilty of capital murder if he knowingly causes the death of . . . [a]nother before, after, while engaged in the commission of, or while attempting to commit kidnapping as that offense is defined in RSA 633:1"); *see also State v. Green*, 616 P.2d 628, 634 (Wash. 1980) ("kidnapping is a specific element of aggravated murder in the first degree. It is, however, a separate and distinct statutory crime having specific elements each of which must be established beyond a reasonable doubt.").

The parties appear to agree, and the jury instructions reflect, that a kidnapping "incidental" to the commission of the murder would not suffice

to support conviction. The issue before us, therefore, turns on the meaning of the word "incidental." The defendant argues that the confinement of Reid needed to have independent significance from the crime of murder, and that in order to have such significance, the *purpose* of the confinement must have been other than the murder. The State maintains that the trial court accurately stated the law when it instructed that, in order to convict, the jury had to agree that either: (1) the confinement was designed to accomplish something other than Reid's death (namely, to terrorize Reid), *see* RSA 633:1, I(c); or (2) "the confinement was contemplated or expected to last for some appreciable period of time beyond that necessary to accomplish the killing."

■ "Whether restraint and movement are merely incidental to another crime or support kidnapping as a separate crime is a fact-specific determination based on the totality of the circumstances." *State v. R.A.*, 2005 WL 2271889, at *3 (Wash. Ct. App. 2005); *see also Goodhue*, 833 A.2d at 866. "In making that determination, our guiding principle is whether [the] defendant's restraint of the victim was so much the part of another substantive crime that the substantive crime could not have been committed without such acts and that independent criminal responsibility may not fairly be attributed to them." *McEathron*, 926 N.Y.S.2d at 251 (brackets and quotations omitted).

> In determining whether a separate kidnapping conviction was supportable, courts have considered various factors, including whether evidence of the seizure, detention, or movement was or was not inherent in the nature of the underlying crimes; whether the crime was facilitated by the confinement; whether the movement or confinement prevented the victim from summoning assistance; whether the movement or detention lessened the defendant's risk of detection; and whether the movement or detention created a significant danger or increased the victim's risk of harm.

*Goodhue*, 833 A.2d at 865.

■ The defendant's reading of the statute — requiring the confinement to be for a purpose other than the underlying murder without consideration of the totality of the circumstances or any factor other than the purpose of the confinement — does not accord with other jurisdictions' interpretations of the merger doctrine. *See Salamon*, 949 A.2d at 1117 (concluding that, "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime").

Nor does such an interpretation comport with the fairness purposes of the merger doctrine, which require analysis of whether the restraint constituted "a minimal intrusion necessary and integral to another crime, . . . simultaneous and inseparable from another crime," or rather "a crime in itself." *McEathron*, 926 N.Y.S.2d at 251 (quotations omitted).

We agree with the Washington courts that "simply because the restraint takes place to facilitate another crime does not by itself render that restraint 'merely incidental.' " *R.A.*, 2005 WL 2271889, at *4. The defendant's argument that, if he restrained the victim solely for the purpose of killing him, then he did not commit kidnapping,

> ignores the "totality of the circumstances" analysis *Green* mandates. Under [the defendant's] reasoning, there could be no kidnapping anytime the victim was restrained to facilitate a murder, regardless of the nature of the restraint. He would have us view all the events leading up to the murder as merely incidental to the murder itself.

*Id.*

The trial court's instructions to the jury required a unanimous decision as to whether the defendant confined Reid for the purpose of terrorizing him, or, if the purpose of the confinement was to kill Reid, whether "the confinement was contemplated or expected to last for some appreciable period of time beyond that necessary to accomplish the killing." We find no error in this instruction.

*Affirmed.*

DALIANIS, C.J., and HICKS, J., concurred.